[No. F049541. Fifth Dist. Jan. 17, 2008.]

SALLIE MAE BRADLEY, Plaintiff and Appellant, v.
DEPARTMENT OF CORRECTIONS AND REHABILITATION, Defendant
and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., IV., V., VI., and VII.

**COUNSEL**

Law Offices of Benjamin L. Hecht, Benjamin L. Hecht; Law Offices of Bryman & Apelian, Mark D. Apelian; Law Offices of Michael F. Baltaxe and Michael F. Baltaxe for Plaintiff and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Jacob A. Appelsmith, Assistant Attorney General, Barbara J. Seidman and Susan E. Slager, Deputy Attorneys General, for Defendant and Appellant.

OPINION

**WISEMAN, J.**—In this appeal the California Department of Corrections and Rehabilitation (formerly the California Department of Corrections) (hereafter CDC) contends that Sallie Mae Bradley, an individual temporarily working at a California prison as a licensed clinical social worker and placed at the prison pursuant to a contract with the National Medical Registry, is not entitled to the protections afforded by California's Fair Employment and Housing Act (FEHA), Government Code section 12940[1] et seq. In the published portion of this opinion, we conclude that Bradley is an employee within the meaning of the FEHA, even though she is not an official employee of the state for civil service and benefit purposes. We also hold that, regardless of the size of the state bureaucracy and the due process protections given state employees, CDC had a duty to act immediately to stop the sexual harassment directed at Bradley by a coworker and to ensure that no further harassment occurred. Referring the matter to a lengthy and complicated investigative process *alone* is insufficient to comply with the protections mandated by the FEHA when continued contact with the harasser leads to further harassment.

In the unpublished portion of the opinion, we conclude there is sufficient evidence to support the jury's conclusions that Bradley was subject to a hostile work environment and to support the jury's award of damages for lost earnings and emotional distress. We also reject CDC's claim that the trial court erred in admitting evidence that CDC knew the harasser had a criminal history when it hired him, that the harasser made threats against the prison administration, and that the harasser was given a merit increase shortly after Bradley was terminated. We also set aside the trial courts grant of judgment notwithstanding the verdict and reinstate the jury's verdict and damage award on the retaliation cause of action.

## *PROCEDURAL HISTORY*

The complaint alleged that Bradley had been subjected to sexual harassment and a hostile work environment while working at the California Substance Abuse Treatment Facility located at Corcoran State Prison. This occurred as a result of behavior by the prison's Muslim chaplain, Omar Shakir. Although Shakir initially was named as a defendant, he was dismissed from the action before trial. The complaint also alleged that when Bradley complained about Shakir's behavior, she was discharged in retaliation for

---

[1] All further references are to the Government Code.

voicing her complaints. The sexual harassment and retaliation causes of action were resolved in favor of Bradley by jury verdict. Three other causes of action—negligent hiring and supervision, intentional infliction of emotional distress, and assault—were resolved in favor of CDC before judgment.

The jury awarded $300,000 in noneconomic damages, $87,000 in past economic damages, and $2,000 in future economic damages on the sexual harassment claim. The jury also awarded $50,000 in "non-duplicative" past economic damages on the retaliation claim. Judgment was entered on November 9, 2005.

After trial, CDC filed a motion for new trial and a motion for judgment notwithstanding the verdict. The motion for new trial was denied, but the court granted the motion for judgment notwithstanding the verdict with respect to the retaliation cause of action. In doing so, the court concluded that Bradley had no standing to assert the claim, that the damages were not supported by evidence, and that the damages were duplicative and excessive. Bradley was awarded attorney fees in the amount of $305,000.

CDC appeals the judgment on the sexual harassment claim and raises a protective challenge to the award of attorney fees. Bradley appeals the grant of judgment notwithstanding the verdict on the retaliation claim.

## *FACTUAL HISTORY*

Bradley is a licensed clinical social worker and holds a doctorate degree in clinical psychology. She worked at the substance abuse treatment facility (facility) as a clinical social worker from August 4, 2000, to October 4, 2000. Bradley was not hired through the state civil service process and was not issued a state paycheck or provided state employment benefits. Instead, she worked at the facility as a contract worker pursuant to a contract negotiated between CDC and the National Medical Registry (registry). The registry, in turn, contracted with Bradley to work at and provide services to the facility. CDC uses contract workers on a regular basis when needed to supplement regular staff. Bradley filled out a timesheet, recording the hours she worked, which was then certified by her supervisors and forwarded to the registry. The registry billed CDC for the number of hours worked and issued a check to Bradley to compensate her for the hours she worked at the facility.

At the facility, Bradley worked under Chief Psychiatrist Dr. Brim and took direction from Brim or Chief Psychologist Dr. Anthony. Her hours and duties

were set either by Dr. Brim or Dr. Anthony. When working at the facility, Bradley assisted first in the medical surgery department and then in the psychiatric crisis unit, evaluating mental health status and helping to determine whether inmates were malingering. She never received any criticism of her work.

This was not the first time Bradley had worked at the Corcoran State Prison. She had been assigned to the prison for two to three months in the fall of 1999, although she worked at the prison and not at the facility. After her work in 1999, Bradley received good recommendations from prison staff.

Shakir first approached Bradley in August 2000 at the facility. He asked where he knew her from. Bradley remembered that she had met him at the Department of Motor Vehicles in October 1999, when he had offered to help her put on her registration sticker and had commented on her appearance. He mentioned then that he worked at the prison and the two struck up a conversation. Shakir asked Bradley to call him, but she did not. After recognizing Bradley at the facility, Shakir commented that he had begged God to send Bradley back to him and produced a card showing that he was a chaplain at the prison. Shakir was very courteous to Bradley and asked to assist as she settled in. For example, he offered to help Bradley move in to her new apartment and invited her to the Muslim temple and showed her around. In addition, he gave Bradley a key to the temple, saying she was welcome anytime. They had several conversations about spiritual and personal matters during which Bradley told Shakir she was not interested in sexual relationships and had chosen to remain celibate since her husband had died years before. Bradley is a deeply religious person who trusted Shakir because she believed him to be a man of God.

On September 2, after helping Bradley move in to her apartment, Shakir pulled a pair of handcuffs out of his car and said, "[D]o you want these?" When Bradley said "no," Shakir responded, "what if I were to rape you? You might enjoy it." Bradley was shocked and frightened. She told Shakir she was only interested in a professional friendship. Shakir told her God would not let her stay away from him. Shakir left, only to return to the apartment at 4:00 a.m. the next morning, beginning an almost nightly ritual of visiting Bradley in the middle of the night, chanting and pounding on the door of her apartment.

On September 6 when Bradley went to work, Shakir was waiting at the gate. He told her not to be angry, that he only wanted to have sex. He walked very close to her and hit her breast with his elbow. She told him to stay away

and walked off quickly. That same day, Shakir turned up at her workstation, stood within four to five feet of her, and stared at her in a "very sick manner." She was embarrassed. When she told him to leave, he commented on her dress and told her that she looked good enough to eat. She saw him in the hallway later, staring at her. He waved. The intimidating and harassing behavior continued both at home and at work. Bradley believed she could take care of the problem herself, but nothing worked.

On September 12, Bradley called the police to her home after Shakir again showed up in the middle of the night. The police talked to Shakir and then informed Bradley that Shakir seemed obsessed. She was warned to be careful, and the police suggested she obtain a restraining order.

On the morning of September 13, Shakir was waiting for her in the parking lot. He approached her and said, "don't be mad okay. If we were to lock tongues I know that you'd enjoy it." She talked about her problem with coworker Irene Ruff, who referred her to Dr. Brim. Bradley met with Brim that morning. Brim expressed concern and sent Bradley to see Bennett Ndoh, the employee relations officer. Ndoh also expressed concern and sent Bradley to talk to Captain Wan and Sergeant Rocha. Bradley also talked with Dr. Anthony on at least three occasions about the harassment.

Wan and Rocha interviewed Bradley, tape-recording most of their conversation. Bradley told them about the off-prison episodes, as well as what had happened on the grounds. While doing so, she cried and was given a tissue. She told them it was hurtful for her to have to share this problem with them. They gave her some time to compose herself, but when Bradley returned to look for them, they had left the building. Rocha and Wan denied that they ever left Bradley.

Wan called the Corcoran police and Bradley's landlady to verify her story. He reported the complaint to the warden and told him a written report was coming, which he delivered early on September 15. The tape was not transcribed until March 17, 2003, after litigation began. Wan and Rocha told Bradley to prepare a written diary of what had occurred and to let them know if anything else happened. Bradley never prepared the diary, although she contends she did report further incidents to Wan.

After leaving Wan and Rocha's office, Bradley walked by herself to get donuts and coffee. Shakir walked up behind her and Bradley screamed. He told her he was going to "have" her and she might as well get used to the idea. He also said he could not believe she would report him and that the

prison would not do anything to him. When Bradley called to report this incident to Wan, no one answered, so she called Corcoran police again. Officer Leach met Bradley in the prison parking lot and gave her paperwork so that she could start the process of getting a restraining order. Shakir followed Bradley to the parking lot and when she left, he was sitting in his car and gave her a cold angry stare.

On September 14, Bradley was sent to equal employment opportunities counselor Elise Tienken. Edward Sanchez, associate warden, the individual in charge of the facility's equal employment opportunities program, asked Tienken to meet with Bradley. Bradley told her story again, and Tienken arranged to have Bradley file a formal sexual harassment complaint. Bradley turned in the written formal complaint on September 15.

Tienken distinctly remembered two incidents occurring at work that Bradley mentioned in their conversation on September 14. The first was when Shakir arrived in the records area while Bradley was filing and then stared at her, making her feel uncomfortable. The second was when Shakir timed his arrival at the prison to correspond with that of Bradley, even when she tried to vary her arrival times. Bradley initially had coworker Alice King come to work with her and accompany her to Bradley's workstation; however, Dr. Anthony objected to this procedure so it was discontinued. To make matters worse, on September 14, as Bradley was leaving the facility, Shakir came from behind a prison building and said, "I don't believe you reported me to the police. I just want to take care of you. I want to have sex with you. You'll enjoy it."

Bradley also met with Edward Sanchez. She told him about Shakir's behavior at work and outside the prison. Sanchez took no notes, but told her to buy binoculars, not to go out alone, to get a restraining order, and to carry a cell phone. He said he had talked to Shakir and given him a letter on September 14; however, Shakir had not taken responsibility for his behavior, and Sanchez could not assure Bradley that Shakir would leave her alone. Further, Sanchez never listened to Wan's tape of the interview with Bradley. Sanchez told Shakir's supervisor that a complaint had been filed against Shakir but did not tell her it was a sexual harassment complaint or instruct her to restrict Shakir's movement about the prison. Shakir had free range of the prison and his supervisor had difficulty keeping track of his whereabouts.

According to Bradley, Shakir frequently came to her work area after September 15. He would stare, in a "sick way," at her breasts and "private zone." He told her that if she did not want him, he had an attorney friend in Fresno who would have her. On two occasions, he tried to grab her or touch

her and told her he always got what he wanted. He approached her when she would walk from building to building and when she was getting off work. On September 19, Shakir met Bradley in the parking lot. He was in a car that pulled up to her. He told her she looked good enough to eat. Overall, Bradley testified she had at least 10 contacts with Shakir after reporting the harassment to CDC.

According to Bradley, she reported these additional incidents to Wan and to Brim. She told them Shakir's attention made her feel frightened and uncomfortable. Bradley said after her initial meetings with Wan and Sanchez, no one ever got back to her, and she continued to see Shakir at the facility, even after September 25, when Shakir left work for a month on sick leave. She saw him on September 28 or 29 while going to the administration building. He was in the packaging area and waved. On October 4, he passed her in the hallway and said, "hey, good looking," and "don't be mad . . . ."

On October 4, Dr. Brim called Bradley in and gave her a letter terminating her employment at the facility. Although he complimented her on her job performance, he told her the "census was down" and they had to let her go. Bradley knew the census was not down, which was confirmed at trial. In addition, Dr. Brim testified that, although he told Bradley they no longer needed her services, his real reason for terminating her was poor job performance because she simply did not have the skills needed.

After Bradley left the facility, she tried working at Valley State Prison for Women in Chowchilla, but only lasted five days, finding she could not deal with the inmate population. She was diagnosed with posttraumatic stress disorder in January 2001, with the precipitating traumatic event being Shakir's conduct. She needed counseling, suffered from headaches, bowel and urinary control problems, memory impairment, anxiety, panic attacks, depression, lack of energy, mood swings, hypervigilance, lack of sleep, and other physical symptoms. Although she could continue to see clients in her private practice, she was limited in the number and types of clients she could see as a result of her emotional state. She lost income as a result.

Bradley continued to communicate with the CDC office in Sacramento charged with investigating her complaint. She talked to Antonio Aguilar, Marilyn Pearman, and Lisa Williams. She felt no one was taking her complaint seriously and she received no assistance from CDC on how to handle Shakir, even though the harassment was continuing, although not on prison grounds at this point because neither she nor Shakir were working at the facility. The complaint process was terminated on March 13, 2001. No investigation was actually done, other than talking with Bradley. The investi-

gation was closed, in part because Shakir was in the process of being terminated.

In January 2001, Shakir made threats toward Warden Derral Adams and other prison officials. Shakir was immediately put on administrative leave and extra security was ordered at the prison. Due to this incident, Shakir was terminated by a notice dated June 13, 2001. There was evidence at trial that Shakir had prior criminal convictions known to CDC when they hired him and that he had been disciplined on several occasions for providing contraband to the inmates, for being rude to an officer, and for failing to inform his supervisor of his location. In spite of this, before being terminated, Shakir was given a merit salary adjustment in March 2001.

## *DISCUSSION*

### *I. Bradley's employment status*

A key issue during litigation and on appeal is whether Bradley had standing to assert a FEHA claim. According to CDC, because the FEHA makes it unlawful for an employer to "harass an employee, an applicant, or a person providing services pursuant to a contract" (§ 12940, subd. (j)(1)), only an employee, applicant, or person performing services pursuant to a contract has standing to sue under the FEHA. CDC asserts that Bradley does not have standing because she was never an official employee of the state hired pursuant to section 19050 et seq., the statute governing state employment. As a result, CDC contends that she cannot be classified as an employee for FEHA purposes. In addition, CDC argues that Bradley does not meet the statutory criteria for classification as a person providing services pursuant to a contract, and she has not alleged she was an applicant. The trial court disagreed and concluded that Bradley was, as a matter of law, a special employee of the facility and entitled to the protections afforded under the FEHA even though she admittedly was not a state employee. Review of the issue requires that we interpret the meaning of the term "employee" as used in the FEHA, particularly section 12940, subdivision (j).

The FEHA establishes a comprehensive scheme for addressing employment discrimination. As a matter of fundamental public policy, the FEHA was intended to protect and safeguard the right and opportunity of all persons to seek and hold employment free from discrimination. (§ 12920; *Brown v. Superior Court* (1984) 37 Cal.3d 477, 485 [208 Cal.Rptr. 724, 691 P.2d 272].) A trial court's interpretation of a statute is reviewed de novo. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 [100 Cal.Rptr.2d 718].) The de novo

standard of review also applies to mixed questions of law and fact when legal issues predominate. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) Here, there is very little dispute concerning the factual nature of Bradley's employment with CDC. Instead, the dispute centers on how those facts are characterized in the context of the FEHA.

First, we agree with CDC that, as a matter of law, Bradley does not fall within the statutory definition of one who is providing services pursuant to a contract. (§ 12940, subd. (j)(5).) Bradley lacked the necessary control over her work and failed to meet the other statutory criteria. She must meet all the listed criteria to be covered by subdivision (j)(5). Bradley had no control over the means by which she provided her services and was not hired to produce an end product or for special skills beyond those normally provided by CDC employees. She was told when and where to report to work and what her job duties would be. She was not compensated for a specific result but for her time working alongside facility staff. (See Lab. Code, §§ 3353, 2750.5.) Finally, Bradley was not customarily engaged in an independently established business of providing services to inmates. (§ 12940, subd. (j)(5)(B).)

■ Bradley also fails to meet the common law and statutory definition of an independent contractor, the category of individuals the addition of this language intended to bring within the umbrella of the FEHA. (§ 12940, subd. (j)(5); see Stats. 1999, ch. 591, § 8; see also, e.g., Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999–2000 Reg. Sess.) as amended June 1, 1999, pp. 2, 7; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1670 (1999–2000 Reg. Sess.) as amended Sept. 3, 1999, p. 2.) Bradley's lack of control over the work she did for the facility defeats the claim that she is an independent contractor. (See Lab. Code, § 3353 [independent contractor provides service for specified fee and result, under control of principal as to result of work only and not with respect to means by which result is accomplished]; *Wilson v. County of San Diego* (2001) 91 Cal.App.4th 974, 983 [111 Cal.Rptr.2d 173] [independent contractor follows employer's desires only as to results of work and not means by which it is accomplished].) The registry is a temporary service agency whose role is to connect potential employers with potential employees outside the normal hiring practices of the employer. The registry agreed to provide CDC with individuals to meet its staffing needs. CDC reviewed Bradley's qualifications and decided whether to employ her. It exercised complete control over her work duties, hours, pay (in that it certified her hours), performance, and length of her employment. Under any definition, Bradley was *not* an independent contractor.

■ In light of the fact that Bradley was not an independent contractor, we next address whether she was an employee under the statutory language. The FEHA itself does not contain a precise definition of "employee." However, the statutory regulations developed by the Fair Employment and Housing Commission (the administrative agency charged with interpreting the FEHA) do define the term. (See § 12935, subds. (a), (h).) ■ We are required to give great weight to an administrative agency's interpretation of its own regulations and the statutes under which it operates. (*Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1029 [130 Cal.Rptr.2d 662, 63 P.3d 220].)

■ With these policies in mind, we look to California Code of Regulations, title 2, section 7286.5, subdivision (b), which defines "employee" as "[a]ny individual under the direction and control of an employer under *any appointment or contract of hire* or apprenticeship, express or implied, oral or written." (Italics added.) Nothing in this regulation mandates that the contract of employment be direct or that persons working for the state are only employees for purposes of the FEHA if hired pursuant to the merit selection process. (See *Vernon v. State of California* (2004) 116 Cal.App.4th 114, 123 [10 Cal.Rptr.3d 121] [FEHA requires some connection with employment relationship, but connection need not be direct]; see also *Scheidecker v. Arvig Enterprises, Inc.* (D.Minn. 2000) 122 F.Supp.2d 1031, 1038 [finding of joint employer is proper where one company has retained sufficient control of terms and conditions of employment of employees who are actually employed by another].) The regulation includes within its definition of "employee" the common law requirement that the employer exercise direction and control over the person's work—the keystone of the employment relationship. (*Villanazul v. City of Los Angeles* (1951) 37 Cal.2d 718, 721 [235 P.2d 16].) Further, the existence of the right of control is often tested by determining whether, if instructions were given, they would have to be obeyed and whether there was a right to terminate the service at any time. (*Id.* at p. 721.)

■ California Code of Regulations, title 2, section 7286.5, subdivision (b)(5), further provides that "[a]n individual compensated by a temporary service agency *for work to be performed for an employer contracting with the temporary service agency* may be considered an employee of that employer for such terms, conditions and privileges of employment under the control of that employer. Such an individual is an employee of the temporary service agency with regard to such terms, conditions and privileges of employment under the control of the temporary service agency." (Italics added.) This language reflects that the employment relationship for FEHA

purposes must be tied directly to the amount of control exercised over the employee. It also defeats CDC's claim that, in order to be an employee, Bradley must be compensated directly by CDC.[2] The law has long recognized that a contracting employer acts as an "employer" for purposes of applying state and federal antidiscrimination laws. (See *Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1184 [10 Cal.Rptr.3d 52].)

We glean no magic formula for determining whether the requisite employment relationship exists. The prevailing view is to consider the totality of the circumstances, reflecting upon the nature of the work relationship between the parties, and placing emphasis on the control exercised by the employer over the employee's performance of employment duties. (*Vernon v. State of California, supra,* 116 Cal.App.4th at pp. 124–125.) Consequently, when a statute fails to define the term "employee," courts routinely look at the common law definition for guidance, focusing on the amount of control the employer exercises over the employee. (*Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 500–501 [9 Cal.Rptr.3d 857, 84 P.3d 966] (*Metropolitan*).)

This approach was followed in *Metropolitan, supra,* 32 Cal.4th 491, 500-501. Although *Metropolitan* deals with the interpretation of the Public Employees Retirement Law (§ 20000 et seq.), its analysis is helpful. There, the issue was whether employees supplied by a labor contractor to a public agency participating in the state retirement plan were participants in the state plan. The statute expressly excluded independent contractors, but the Supreme Court determined, as had the appellate court, that the workers were not independent contractors, but actually employees under the common law definition (used because the Public Employees' Retirement Law does not define "employee"). (*Metropolitan, supra,* 32 Cal.4th at pp. 500–501.) The employing agency exercised full control over the work and the workers even though the workers were not full-time permanent civil service employees. The agency decided whether a particular applicant would work, what jobs the person would do, his or her hours, who supervised the individual's work, and how long the person would remain working, among other factors. The court observed that, whether an agency chooses to classify an employee as eligible for benefits under civil service or merit selection rules is not controlling for

---

[2] Bradley was paid by CDC pursuant to the terms of the contract between CDC and the registry and between the registry and Bradley. Although the method of payment through the registry was indirect, the compensatory nature of the paycheck was direct. It was for the exact number of hours worked by Bradley, approved by CDC, billed by the registry, and paid by CDC. This case is distinguishable from the case relied upon by CDC, *Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625 [27 Cal.Rptr.3d 452], in which the person seeking relief under the FEHA was a volunteer. Bradley obviously was not a volunteer.

purposes of classification under the Public Employees' Retirement Law. Instead, the court said it must look to the spirit and letter of the law that it was interpreting to decide whether to include the worker within the definition of an "employee." (*Metropolitan, supra,* at pp. 504–505.) The court observed that, since "the Legislature has expressly provided for separation of certain payments and benefits (workers' compensation and unemployment insurance) from employment as defined at common law, but has not done so for public retirement benefits, the court may not write such an omitted exception into the [Public Employees' Retirement Law] statutes. As the Court of Appeal explained, 'such revision is a legislative, not a judicial, responsibility.' " (*Id.* at p. 506.) Likewise, in our situation, the Legislature did not tie the definition of "employee" for FEHA purposes to the merit selection process; it left the definition open to common law principles.

■ This approach does not premise liability on a common law theory as CDC claims, but instead uses common law principles to define a statutory term where no definition is provided. Liability remains premised on a statutory cause of action and is consistent with section 815 (public entities not liable for injury unless otherwise provided by statute). Significantly, the FEHA expressly identifies the state as an employer for purposes of its protections. (§ 12940, subd. (j)(4)(A) [employer includes state or any political or civil subdivision of the state].) In addition, the regulations reflect the common law premise that employment for purposes of the FEHA is based on the amount of control an employer exercises over the work performed. We believe that, under either the common law definition or the regulatory definition, Bradley was a special "employee" of CDC for FEHA purposes.

The hiring of registry employees is a common practice used by many state agencies to fill their staffing needs. Temporary workers are hired instead of initiating the lengthy and expensive process of hiring regular permanent employees. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999–2000 Reg. Sess.) as amended June 1, 1999, p. 7.) CDC regularly invokes this practice to meet its staffing needs, not only at the facility but throughout the state prison system, as evidenced by its contract with the registry. If we were to accept CDC's position that because Bradley is not a civil service employee she is not entitled to FEHA protections, there would be a large number of people working daily in our state prison system (and presumably in other state agencies) without protection under the FEHA. This is inconsistent with the legislative intent to expand FEHA protection to the largest number of individuals possible, including those who traditionally would be excluded from the employment relationship because they exercise complete control of the services provided. It is also contrary to statutory language stating that the FEHA applies to the state as an employer. In fact,

CDC's own sexual harassment policy indicates that it applies to individuals who provide contract services to CDC.

Our conclusion is not undermined by language in the CDC/National registry contract asserting that Bradley is an agent or employee of the registry, and not an employee of the state, because the contract also grants all control of the employment relationship to CDC, not the registry. Bradley's contract with the registry equally asserts that she is not an employee of the registry, but an independent contractor. In spite of this, the registry gave all control of their relationship to CDC, not Bradley. CDC's control precludes a finding that Bradley is an independent contractor or a person providing services pursuant to a contract as defined in section 12940, subdivision (j)(5). Although the language of the governing contract is one factor to be considered in determining the nature of the employment relationship, it is not controlling. (*Metropolitan, supra*, 32 Cal.4th at p. 508 [replacing established common law test for employment with complete deference to parties characterization of relationship is improper, especially when issue is one of statutory interpretation]; *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 951 [88 Cal.Rptr. 175, 471 P.2d 975] [contractual terms not conclusive; key is right to control]; *Vernon v. State of California, supra*, 116 Cal.App.4th at pp. 124–125 [no one factor is decisive in determining nature of employment relationship under FEHA].) In this case, although Bradley is described in the contract as a nonemployee/independent contractor, there are other inconsistent provisions describing Bradley's relationship to the CDC which undermine this characterization.

██ CDC argues that, if Bradley is a special employee, employed by both it and the registry,[3] then the registry is an indispensable party under Code of Civil Procedure section 389, subdivision (a). We disagree. The controlling test for determining whether a person is an indispensable party is whether, if the affirmative relief sought by a plaintiff is granted, the relief granted would injure or affect the interest of a third person not joined. (*Save Our Bay, Inc. v. San Diego Unified Port Dist.* (1996) 42 Cal.App.4th 686, 692 [49 Cal.Rptr.2d 847].) There is no basis alleged or proven for holding the registry liable for

---

[3] Given our conclusions that common law principles apply for FEHA purposes in defining the term "employee," we question whether the registry has sufficient control over Bradley's work to be a joint employer under the statute. The registry had no control over Bradley's work environment while she was placed at CDC and asserted very little control over the hiring process. (See *Astrowsky v. First Portland Mortg. Corp., Inc.* (D.Me. 1995) 887 F.Supp. 332, 337 [in absence of any control, there is no meaningful employment relationship].) At best, it exercised only limited control over compensation and initial communication between Bradley and CDC. In any event, for reasons we address, we need not consider whether the registry is technically a joint employer given the lack of any evidence that it is liable for the harassment Bradley suffered at the facility.

any part of the harassment. In fact, there is no evidence that the registry had *any* notice that Shakir was harassing Bradley or that CDC had failed to respond to her complaint.

█ CDC also argues that California Code of Regulations, title 2, section 7286.5, subdivision (b)(5), requires allocation of liability between the temporary agency and the contracting employer. We disagree with CDC's characterization of this section. To the contrary, it states that an employee may be considered an employee of the contracting employer for "such terms, conditions and privileges of employment under the control of that employer." (*Ibid.*) Similarly, the temporary service agency may be considered the employer "with regard to such terms, conditions and privileges of employment under the control of the temporary service agency." (*Ibid.*) The key is that liability is predicated on the allegations of harassment or discrimination involving the terms, conditions, or privileges of employment *under the control of the employer*, and that the employment relationship exists for FEHA purposes within the context of the control retained. There are no allegations in the complaint nor is there any evidence to suggest that liability might rest on terms, conditions, or privileges of employment under the control of the registry. To the contrary, all of the allegations relate to matters under CDC's control.

We recognize that Bradley's claim of harassment extends beyond the workplace; however, CDC's liability is not predicated on preventing the off-work harassment, but in failing to consider Shakir's entire behavior when evaluating the need for prompt and immediate action. There are no allegations involving any harassment originating from or relating to the relationship Bradley had with the registry. The statutory allocation is predicated on control, consistent with the common law principles we have discussed governing the employment relationship. This regulation confirms that it is the entity exercising control over the employment relationship that is the employer for purposes of FEHA liability.

Since we agree based on undisputed facts that, as a matter of law, Bradley was a special employee of CDC for purposes of the FEHA, we need not address CDC's contention that the trial court erred in failing to instruct the jury that Bradley was required to prove her employment status. We also do not need to address the contention that a jury finding was required on the issue.

*II. Substantial evidence to prove hostile workplace*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 1612.

*III. Substantial evidence to prove failure to take prompt corrective action*

It is undisputed that Bradley did not report the harassment to CDC until September 13, 2000. CDC correctly argues that, because Shakir was not a management employee, CDC can only be held liable for its actions after September 13. (*Burlington Industries, Inc. v. Ellerth* (1998) 524 U.S. 742, 759 [141 L.Ed.2d 633, 118 S.Ct. 2257].) It does not necessarily mean, however, that the conduct occurring before September 13 is irrelevant when evaluating CDC's response to Bradley's complaint.

 It is undisputed that Dr. Brim referred Bradley immediately to the warden's office where she met with Ndoh. From there, the formal complaint process was initiated. The issue is whether what followed was sufficient to comply with the statutory mandate that an employer learning of harassment "take immediate and appropriate corrective action." (§ 12940, subd. (j)(1).) Whether CDC's response was sufficient is a question of fact. (*Reitter v. City of Sacramento* (E.D.Cal. 2000) 87 F.Supp.2d 1040, 1046 [jury to resolve whether employer's response adequate under all circumstances].) The jury found that CDC failed to take immediate corrective action designed to end the harassment. CDC claims there is insufficient evidence to support this finding. Given the applicable standard of review, CDC has a difficult burden to overcome since we must view the evidence in the light most favorable to Bradley, giving her the benefit of every reasonable inference and resolving all conflicts in her favor. (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 589 [36 Cal.Rptr.3d 154].)

 Once an employer is informed of the sexual harassment, the employer must take adequate remedial measures. The measures need to include immediate corrective action that is reasonably calculated to (1) end the current harassment and (2) to deter future harassment. (*Sarro v. City of Sacramento* (E.D.Cal. 1999) 78 F.Supp.2d 1057, 1061–1062.) The employer's obligation to take prompt corrective action requires (1) that temporary steps be taken to deal with the situation while the employer determines whether the complaint is justified and (2) that permanent remedial steps be implemented by the employer to prevent future harassment once the investigation is completed. (*Swenson v. Potter* (9th Cir. 2001) 271 F.3d 1184, 1192.) An employer has wide discretion in choosing how to minimize contact between the two employees, so long as it acts to stop the harassment. (*Id.* at pp. 1194–1195.) "[T]he reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment." (*Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 882.)

■ CDC correctly observes that it did not have control over Shakir's behavior when he was not at work and is not liable for these actions. (*Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1419–1421 [56 Cal.Rptr.3d 501] [no liability where incidents took place outside workplace and not related to employer's interests].) As we have stated, when harassment is by a nonsupervisory employee, an employer's liability is predicated not on the conduct itself, but on the employer's response once it learns of the conduct. (*Ibid.*)

■ We also agree with CDC that the "most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified. An investigation is a key step in the employer's response . . . ." (*Swenson v. Potter, supra,* 271 F.3d at p. 1193.) However, initiating an investigation, especially one as removed and bureaucratic as the one here, cannot be the only step taken. An employer is required to take remedial action designed to stop the harassment, even where a complaint is uncorroborated or where the coworker denies the harassment. (See *Hathaway v. Runyon* (8th Cir. 1997) 132 F.3d 1214, 1224; *Fuller v. City of Oakland, Cal.* (9th Cir. 1995) 47 F.3d 1522, 1529.)

CDC's investigation was a factfinding undertaking. No component was designed to protect Bradley from harassment. As part of the investigation, Bradley talked to many individuals, but none of them saw it as their responsibility to (1) determine fault, (2) ensure Bradley was safe from harassment, or (3) determine if there were steps CDC needed to take to stop the harassment. In most cases, other than listening to Bradley and referring Bradley to yet another individual, the person hearing Bradley's complaint did nothing. There was no followup, no evaluation of the need for protection, and no further investigation.

Dr. Brim referred Bradley to the warden's office because he believed he could not do anything else. Brim knew Bradley was having a "tough time" with Shakir, but made no effort to assist her in preventing contact in the workplace. At the warden's office, Ndoh interviewed Bradley. He referred the matter to Captain Wan because Bradley had contacted an outside law enforcement agency when she called the Corcoran police for assistance. Ndoh did not followup with Bradley or Wan because he did not want to interfere in the investigation. Wan testified that his function was to investigate minor state employee misconduct and that he was not trained to handle sexual harassment complaints. He did not believe he had been charged with investigating a sexual harassment complaint. Wan prepared a careful report and tape-

recorded his interview with Bradley, forwarding both to the warden's office. Even though Bradley expressed a concern for her safety and complained of harassment on and off prison grounds, Wan took no steps to protect Bradley because he believed she was protected while on the prison grounds. He believed Associate Warden Sanchez would handle the complaint once the interview was completed.

The matter was also referred to Sanchez, who read Wan's report but did not listen to the tape. He acknowledged that he needed to stop the harassment and get the other side of the story. Sanchez asked equal employment opportunities counselor Elise Tienken to interview Bradley. Tienken said her role was to listen and make a report. She gave her report to the warden, but did nothing else.

Sanchez did not interview Shakir or order him interviewed. He did not review Shakir's personnel file. Sanchez said he did talk to Shakir for seven to 10 minutes and personally handed Shakir a letter informing him that a complaint had been made and asked Shakir to refrain from contacting Bradley. The letter stated, "Your cooperation is expected and appreciated." Sanchez told Shakir's supervisor there was a complaint but did not say it was a sexual harassment complaint or give the supervisor any instructions on how to address the situation. The record does not reflect what was said in the short conversation, but there was no threat of discipline for noncompliance with the no-contact directive. Sanchez made no attempt to determine whether Shakir was complying with the directive given, even though Sanchez himself did not believe Shakir would abide by any directive he was given. Sanchez told Bradley he could not assure her that Shakir would leave her alone. Sanchez took no further action because, on authority of the warden, he referred the matter to Sacramento for additional investigation. Ironically, CDC's own sexual harassment training manual instructs its management-level employees that telling the harasser to leave the employee alone is insufficient to meet the statutory requirement of remedial action. In spite of all this, CDC did nothing to ensure that, while on prison grounds, Bradley would be free of harassment by Shakir.

Warden Adams testified that the employee relations officer deals with labor issues but does not do sexual harassment investigations. Yet, this is where Bradley was first referred by Brim. Adams also said Captain Wan's office does not do sexual harassment investigations, yet that is where Ndoh referred Bradley. Adams admitted that the equal employment opportunity office does deal with discrimination claims, including harassment, but said that most of these functions occur in Sacramento. Adams also said that if an employee had

threatened another employee, that employee would be placed on administrative leave until an investigation could be completed. Yet, this did not happen in Bradley's case. Adams said he was unaware of the rape threat, even though it was recorded in Wan's report and in the taped interview of Bradley.

Once Bradley's complaint found its way to Sacramento, it faced the same bureaucratic morass. Anthony Aguilar reviewed the complaint to determine whether a formal investigation should occur. Aguilar received the intake assignment on September 15. He did nothing until October 13 because Sanchez had not forwarded official authority from the warden to process the intake. Consequently, it took nearly a month in Sacramento for Aguilar to determine whether the complaint warranted a complete formal equal employment opportunity investigation. He was to make no determination of fault and to take no remedial action to protect Bradley. Aguilar concluded that, because the harassment posed a safety threat to Bradley, the complaint could not be resolved at the local level and he referred it to yet one more office within the CDC bureaucracy for a formal investigation. This is especially incongruous because, despite recognition that Bradley's safety was at risk, no one at CDC thought to implement any means of protecting Bradley from Shakir. The only action Aguilar took was to remind Sanchez of his duty to monitor the situation, which Sanchez did not do because he did not want to interfere with Sacramento's investigation. Aguilar admitted that any immediate and appropriate response would normally have to be at the local level.

Lastly, investigator Lisa Williams testified that her job was to investigate complaints and determine whether the complaint had merit. She said her role was not to protect Bradley from harassment. She called Bradley, who expressed understandable frustration with the lack of assistance she received from CDC. By this time, Bradley had been terminated from CDC. Despite her job as a neutral investigator, Williams did not interview Shakir, look at the jobsite, speak to Shakir's supervisor, or interview any of the other witnesses.

At trial, CDC attempted to establish that Bradley would not have been harmed while at the facility because it was guarded heavily by armed security. This is contrary to the evidence, which established that Shakir did accost Bradley while she was on prison grounds, even *after* she reported the harassment.

While we recognize that things move slowly in state government, the lack of action in this case is startling. Numerous people heard Bradley's complaints yet did nothing to protect her or to stop the harassment. Very little investigation was done, even though CDC claims it took immediate action by initiating the investigation. No one gathered any evidence other than

Bradley's statement, which she was required to repeat numerous times. Each person she contacted acted like it was someone else's job to take immediate and corrective action. *Nothing* happened locally to ensure that Shakir would stop harassing Bradley, despite evidence that the harassment was severe, that Shakir was able to move freely around the institution, that physical threats had been made, and that Shakir had a known history for breaking rules and ignoring supervisorial direction.

CDC cannot rest on its complex investigation process since the statute mandates remedial action designed to *end* the harassment. (See *Faragher v. Boca Raton* (1998) 524 U.S. 775, 806 [141 L.Ed.2d 662, 118 S.Ct. 2275] [antidiscrimination statute's primary objective is not to provide redress but to avoid harm].) CDC may not wait to act until it decides whether the complaint is valid. (*Hope v. California Youth Authority, supra,* 134 Cal.App.4th at p. 594 [agency did too little when it failed to stop harassment because alleged perpetrator denied it]; *Hathaway v. Runyon, supra,* 132 F.3d at p. 1224 [employer may be required to take remedial action even when harassment is not corroborated].)

 CDC urges us to dissect the parties overall behavior and argues that, because the more serious behavior happened off premises, it was not required to address what it classified as insignificant behavior onsite. We disagree with this view of the evidence. Shakir was engaged in classic stalking behavior, terrorizing, intimidating, and humiliating Bradley and taking full advantage of his free access to her at work to accomplish his inappropriate goals. The sum total of CDC's response was to refer the complaint to a bogged-down investigative process and to caution Bradley to protect herself. CDC failed even to advise Bradley about what was happening to her complaint. In addition, Bradley asked CDC to help her serve on Shakir the restraining order recommended by CDC personnel, but received no help in doing so. Finally, the evidence does not support CDC's claim that Bradley was told to report any further harassment and never did.

For all these reasons, we conclude that ample evidence supports the jury's finding that CDC failed to take immediate and appropriate action as required by law.

*IV.–VII.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1612.

## *DISPOSITION*

The judgment is affirmed. The order granting judgment notwithstanding the verdict is reversed and the jury verdict on the retaliation claim is reinstated. Costs are awarded to Bradley.

Vartabedian, Acting P. J., and Levy, J., concurred.