Filed 6/28/13  Schwaia v. Lakeside Union School Dist. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| SHERRAL ANN SCHWAIA, | D060314 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2008-00065857-CU-OE-EC) |
| LAKESIDE UNION SCHOOL DISTRICT et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

The Spencer Law Firm, Marilyn M. Spencer and Arthur H. Skola for Plaintiff and Appellant.

Stutz Artiano Shinoff & Holtz, Daniel R. Shinoff and Paul V. Carelli IV, for Defendants and Respondents.

INTRODUCTION

Sherral Ann Schwaia appeals from a judgment finding her employer, Lakeside Union School District (District), did not violate the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[1] by, among other acts, failing to reasonably accommodate her disability and failing to engage in the interactive process in good faith. She contends the undisputed evidence shows her employer violated FEHA in both respects and, therefore, the court erred in rendering a judgment in the District's favor. We conclude the court did not err in this manner and affirm the judgment.

BACKGROUND[2]

Schwaia is a school bus driver for the District. Her position includes both indoor and outdoor work. The District has two types of buses: a longer Type-1 bus and a shorter Type-2 bus. At the beginning of 2004, Schwaia drove a Type-1 bus. At that time, some of the Type-2 buses had air conditioning, but the Type-1 buses did not.

In January 2004 or earlier, Schwaia began having symptoms of multiple sclerosis (MS). In March 2004 a neurologist diagnosed her with the disease.

MS is a progressive, autoimmune disease affecting the central nervous system, particularly the brain and spinal cord. It is unpredictable in that a patient can have an

---

[1]    Further statutory references are also to the Government Code unless otherwise indicated.

[2]    "Following the usual rules on appeal from a judgment rendered after a trial, we view the facts in the light most favorable to the judgment." (*Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 346, fn. 2.)

2

attack anywhere along the central nervous system at any time and of any severity. Common symptoms of the disease include visual problems and weakness in the extremities. The disease may impair an individual to the point the individual cannot safely operate a motor vehicle.

After receiving the diagnosis, Schwaia told Norman Lumpkin, the District's then director of maintenance operations and transportation, she had MS and provided him with general information about the disease. Lumpkin researched the disease further and questioned whether a person with MS could safely drive a school bus.

Meanwhile, on April 1, 2004, Schwaia saw a nurse practitioner. The nurse practitioner worked for Schwaia's neurologist, who specialized in the treatment of MS. Schwaia told the nurse practitioner she worked in a "very hot bus" with no air conditioning. According to the nurse practitioner, exposure to heat, meaning anything over 65 degrees, can cause a patient's symptoms to recur. In Schwaia's case, exposure to heat could cause symptoms of weakness and numbness in her legs and arm to recur.

Consequently, the nurse practitioner thought it would be best if Schwaia worked in an air-conditioned bus and she wrote Schwaia a note stating, "Sherral Schwaia has a condition that requires an air-conditioned environment at all times. Heat may exacerbate her condition. If you have any further questions, please contact my office at [phone number]. [¶] Thank you for your understanding." At trial, the nurse practitioner clarified that by air-conditioned environment at all times she meant Schwaia should have "an air-conditioned bus at all times."

3

Schwaia gave the note to the District. Lumpkin communicated its contents to his supervisor, Kamran Azimzadeh, the District's deputy superintendent. Azimzadeh instructed Lumpkin to provide Schwaia with an air-conditioned bus. Within a few days of receiving the note, Lumpkin provided Schwaia with one of the Type-2 buses that had air conditioning.

The Type-2 buses usually carry disabled students, some of whom need assistance getting on and off. The District's rules prohibit a bus from continuously idling when a driver gets out of it. Instead, the driver must shut the bus off, remove the key, and put it away. After the driver is done assisting the student, the driver must start the bus up again.

Not long after the District provided Schwaia with an air-conditioned bus, she requested the District install an interlock device on the bus.[3] The device keeps the bus's engine running when the driver leaves the driver's seat to load and unload students, which allows the air conditioning to stay on continuously. Schwaia told Lumpkin she wanted the device to maintain an air-conditioned environment at all times while she was on the bus. Schwaia never told Lumpkin she needed the device because the existing air conditioning in the bus was insufficient by itself to alleviate or control her MS symptoms.

Lumpkin spoke with Azimzadeh about the request and Azimzadeh asked Lumpkin to research the device. Lumpkin obtained the necessary information and provided it to

---

[3]    She also requested the ability to go home when she felt sick and to have a substitute driver accompany her when it was hot. These requests are not at issue in this case.

Azimzadeh.  The cost of the device was $1,000 or less; however, installation of it required approval from the California Highway Patrol (CHP).  Azimzadeh told Lumpkin he would get back to him on the matter.

Sometime before June 30, 2004, Lumpkin saw Schwaia using a cane to walk.  The same day she asked Lumpkin to have another driver drive for her while she rode the bus.  Lumpkin told her that if she was ill, she needed to report she was sick and go home.  Lumpkin contacted Azimzadeh and relayed his concern about Schwaia being unable to safely drive a bus.  Azimzadeh shared the same concern.

The District's neurology expert testified MS definitely has the potential to interfere with a person's ability to safely drive a commercial vehicle, and Schwaia appeared to have worked in 2004 while experiencing symptoms raising safety concerns.  The expert further testified that, although exposure to heat can make an MS patient feel worse, patients with MS do not need to be in an air-conditioned environment at all times and such a requirement would be impractical to implement.  He also testified Schwaia's medical records did not include any findings indicating the lack of air conditioning caused an exacerbation of her symptoms and, in his opinion, Schwaia's periodic need to exit her bus and go outside in the heat for short durations to load and unload children did not raise a concern about heat exposure.

The District's bus drivers bid by seniority for bus routes in September, January, and June.  In the summer of 2004, Schwaia bid for and obtained a route as a bus aide, rather than as a bus driver.  She bid on this route because it allowed her to work 25 hours as an aide, instead of 20 hours as a driver, and she would make more money.

In September 2004 Lumpkin provided Schwaia with a bus driver job description. He asked her to have her doctor review the job description and provide the District "with a medical opinion about the job duties and any limitations placed upon you by your illness."

In October 2004 Lumpkin spoke with Schwaia and again asked her to provide the District with a medical opinion from her doctor about her ability to drive a bus and any limitations she had. Schwaia thought Azimzadeh was out to get her and told Lumpkin she would not provide the information. Lumpkin subsequently sent Schwaia a memo stating she had four days to supply the requested information or she would be placed on sick leave. When Schwaia did not supply the requested information within the specified time frame, Lumpkin sent her a letter stating she had to supply the requested information within 12 days or he would recommend disciplinary action against her, up to and including her dismissal.

In late October, Schwaia provided the District with a handwritten note from her neurologist indicating she was "currently physically capable of doing all her daily job functions." However, the note also stated the neurologist could not "certify her to drive school [buses] because we do not perform driving tests here at Scripps Clinic." The District's neurology expert testified the note was contradictory because driving a bus was Schwaia's daily job function. Of additional relevance here, the note did not state Schwaia needed an air-conditioned bus, an interlock device, or any other accommodation to do her job.

6

After receiving the note, Lumpkin sent Schwaia another letter indicating the District needed a medical professional to advise whether further periodic reviews of her condition were necessary. Instead of supplying the additional information, Schwaia filed a grievance, claiming the District's request amounted to discrimination.

Meanwhile, in November 2004 Schwaia applied to the DMV for an endorsement on her driver's certificate limiting her to driving only Type-2 buses with hydraulic brakes. At that time, the District required its drivers to be able to drive both Type-1 and Type-2 buses and, consequently, did not permit its drivers to have this endorsement. However, Schwaia requested the District allow her to have the endorsement and the District agreed to accommodate her request.

Then, in February 2005 while her grievance was pending, Schwaia's neurologist handwrote an addendum to his earlier note. The addendum indicated he could not state how long the opinions expressed in his earlier note would apply and he would update them if any significant changes occurred. The addendum also indicated that, unless a new problem appeared, Schwaia only needed to be seen once a year. Azimzadeh never saw the note and Lumpkin could not recall ever seeing it.

Schwaia's grievance proceeded through various levels to mediation. During a break in the mediation, Azimzadeh spoke with Schwaia and ask her how she was doing. She mentioned she would like an interlock device. He told her he would look into providing the interlock device if medical professionals recommended it. Schwaia never provided the District with any document from any medical provider indicating she needed the interlock device to perform the essential functions of her job.

7

During the mediation itself, Azimzadeh offered to train Schwaia for an indoor job. Concerned about losing her seniority, Schwaia rejected the offer because Azimzadeh would not guarantee the job. Azimzadeh explained that his own job was not guaranteed and he could not guarantee any job within the District.

The mediation ended in an agreement that Schwaia would submit to a fitness-for-duty examination at the District's expense. There was no agreement to provide Schwaia with an interlock device.

The District's doctor completed the fitness-for-duty examination in March 2005. The doctor reported that Schwaia had no limitations, her condition was not likely to interfere with her ability to safely operate a motor vehicle or a school bus, and she could return to her usual and customary duties as a school bus driver. Schwaia did not contest or otherwise respond to the doctor's findings. Based on the findings that Schwaia had no limitations, Azimzadeh decided it was not necessary to install an interlock device on Schwaia's bus.

In November 2005 Schwaia went for a DMV examination. The District received a report of the examination stating Schwaia "has multiple sclerosis which is well-controlled & asymptomatic at this time." In the same report, Schwaia responded "no" under penalty of perjury to questions about whether she had suffered from any eye disorders, vision impairments, or hand, arm, leg or foot impairments. The nurse practitioner testified Schwaia should have responded "yes" to these questions.

In March or April 2006 Azimzadeh saw Schwaia at a party. He asked about her health and thanked her for permitting the District's doctor to examine her. She told him

8

she still would like to have an interlock device for her bus.  Even though no medical professional indicated the interlock device was necessary to accommodate Schwaia, Azimzadeh agreed to provide it because Schwaia was a long-term employee, she had submitted to the fitness-for-duty examination, and he wanted her to be happy.

In May 2006 the District wrote to the CHP requesting approval to have the interlock device installed on a bus.  Two weeks later, the CHP granted the approval.  Within a month, the District had installed the interlock device and the CHP had issued a certificate attesting it was safely installed and operational.

In August 2008 Schwaia sued the District, Azimzadeh, Lumpkin, and a dispatcher for violations of the FEHA, including causes of action for disability discrimination, failure to engage in the interactive process, failure to provide reasonable accommodation, prohibited medical inquiry and examination, harassment, retaliation, and failure to prevent harassment and retaliation.

The court granted summary adjudication as to the causes of action for prohibited medical inquiry and examination, harassment, and retaliation.  As a result of this ruling, the court dismissed the individual defendants with prejudice on the first day of trial.

The court conducted a bench trial as to the four remaining causes of action.  The court ruled against Schwaia and for the District on these causes of action.  As part of its ruling, the court made the following findings:

1.      Schwaia's doctor diagnosed her with multiple sclerosis in March 2004.

2. The same month Schwaia had her driver's license limited so that she could only drive a Type- 2 bus.[4]

3. In April 2004 Schwaia informed the District of the diagnosis and that heat aggravates her condition.

4. The same month the District moved Schwaia to a Type- 2 bus, which had air conditioning.

5. The parties stipulated Schwaia's causes of action sought damages for March 2004 to September 2006.

6. There was no discrimination in April 2004 because the District accommodated Schwaia with an air-conditioned bus.

7. There was no discrimination or damages in the summer of 2004 because Schwaia worked more hours as an aide on a bus than as a driver.

8. In February 2005 Schwaia agreed to submit to a fitness-for-duty examination by Dr. Hughes.

9. In March 2005 Dr. Hughes reported Schwaia could work without limitations.

10. No doctor ever requested that Schwaia be accommodated with an interlock device.

---

4     The evidence actually indicates this occurred later.

DISCUSSION[5]

I

*Standard of Review*

Preliminary, the parties dispute the appropriate standard of review on appeal. Schwaia contends we must review the trial court's judgment de novo. The District contends we must review the trial court's judgment under the substantial evidence test.

The California Supreme Court set forth the general principles for selecting a standard of appellate review in *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881. The court explained, "Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is

---

[5] Schwaia presents no appellate arguments challenging the trial court's judgment as to the causes of action summarily adjudicated or as to the causes of action for disability discrimination and for failure to prevent disability discrimination and harassment. We, therefore, confine our discussion on appeal to her causes of action for failure to provide reasonable accommodation and failure to engage in the interactive process.

predominantly legal and its determination is reviewed independently." (*Id*. at p. 888; accord *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 (*Haworth*).)

Whether the District failed to reasonably accommodate Schwaia and whether it failed to engage in the interactive process in good faith are mixed questions of law and fact. In most instances, we review mixed questions of law and fact independently unless the judicial administration concerns for efficiency, accuracy and precedential weight favor having the trial court determine whether the established facts fall within the applicable legal standard. (*Haworth*, *supra*, 50 Cal.4th at pp. 384-385.) This typically occurs when the applicable legal standard involves a strictly factual test, such as whether a party possesses a particular state of mind. (*Id.* at p. 385.)

The questions presented in this case do not involve the application of a strictly factual test. Additionally, the judicial administration concerns of efficiency, accuracy and precedential weight favor an independent review to ensure consistency in the interpretation and application of FEHA. (*Haworth*, *supra*, 50 Cal.4th at p. 386.) Therefore, we conclude we must independently review the court's determination the District did not violate FEHA's requirements for providing reasonable accommodation and engaging in the interactive process. Nonetheless, we give deference to the court's factual findings that are supported by substantial evidence as the court was in a better position to evaluate and weigh the evidence. (*Id.* at p. 385; see also *Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1623-1624 [appellate courts independently review FEHA dispute where the dispute centers on the application of FEHA to facts].)

12

*Failure to Reasonably Accommodate*

FEHA makes it unlawful for an employer to fail to reasonably accommodate an employee's known physical or mental disability, unless the accommodation would produce a demonstrable undue hardship. (§12940, subd. (m).) " 'The elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability.' " (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 971.)

" '[R]easonable accommodation' means 'a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired.' [Citation.] ' "Reasonable accommodation" may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.' (§ 12926, subd. (o); see Cal. Code Regs., tit. 2, § 7293.9, subd. (a); accord, 42 U.S.C. § 12111(9).)" (*Furtado v. State Personnel Bd.* (2013) 212 Cal.App.4th 729, 745.)

Here, the District accommodated Schwaia's disability by reassigning her to an air-conditioned bus. Additionally, the District allowed her to have a restricted driver's

license prohibiting her from driving Type-1 buses, which are not air conditioned. The District also offered to train her for an indoor position.[6] Each of these accommodations was reasonable under the circumstances.

Although Schwaia preferred the interlock device, "an employer is not required to choose the best accommodation or the specific accommodation the employee seeks. Instead, ' " 'the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.' [Citation.] . . . [A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." ' " (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1194.)

Moreover, none of the medical providers who evaluated Schwaia indicated she needed an interlock device on her bus to accommodate any limitations caused by her MS. Rather, at least after September 2004, her medical records consistently indicated her MS was well controlled with medication, she was asymptomatic, and she had no limitations affecting her ability to perform the essential functions of her job. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229 [an employer may rely on medical provider opinions to gauge an employee's abilities and limitations].) An accommodation is not reasonable and an employer is not required to grant it if the accommodation does not address the employee's limitations or it is not necessary to enable the employee to

---

6      There is some indication in the record the District further agreed to provide her with a substitute driver, up to five times a year, when she felt tingling in her arm.

14

perform the essential functions of the employee's job.  (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1012.)  Accordingly, we cannot conclude the court erred in finding the District did not fail to reasonably accommodate Schwaia.

III

*Failure to Engage in Interactive Process*

FEHA also makes it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." (§12940, subd. (n); *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 978-979.)  "The 'interactive process' required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively.  [Citation.] Ritualized discussions are not necessarily required."  (*Wilson v. County of Orange*, *supra*, 169 Cal.App.4th at p. 1195.)

"Once the interactive process is initiated, the employer's obligation to engage in the process in good faith is continuous.  '[T]he employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed.  This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work . . . .' "  (*Scotch*

15

*v. Art Institute of California*, *supra*, 173 Cal.App.4th at p. 1013.) " ' "When a claim is brought for failure to reasonably accommodate the claimant's disability, the trial court's ultimate obligation is to " 'isolate the cause of the breakdown . . . and then assign responsibility' so that '[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown.' " ' " (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, *supra*, 166 Cal.App.4th at pp. 984-985.)

In this case, when Schwaia first approached the District about her disease and her need to drive an air-conditioned bus, the District quickly accommodated her request. When she asked for the interlock device so the bus's air conditioning could run continuously, the District started looking into the request. Meanwhile, Schwaia bid on and obtained a route as a bus aide, which obviated the need for the accommodation and allowed her to earn more money by working more hours.

Concomitantly, Lumpkin's review of the information Schwaia provided about her disease and his observation of her physical condition caused the District to become concerned about her ability to perform the essential functions of her job, with or without accommodation. Consequently, the District asked her for additional medical information about her disease and its affect on her performance of her job duties. The District's request led to a formal grievance and mediation between the parties.

Because the District needed to know Schwaia's limitations to determine its reasonable accommodation obligations, the grievance and mediation process is appropriately considered part of the interactive process. Additionally, the parties actually discussed accommodations at varying points during the grievance and mediation process,

16

including the District's offer to train Schwaia for an indoor job and Schwaia's renewed request for an interlock device. (See also, fn. 5, *ante*.) As to the latter, the District indicated it would provide the interlock device if Schwaia established its medical necessity.

The grievance and mediation process concluded with Schwaia's agreement to undergo a fitness-for-duty evaluation. The report of the evaluation indicated Schwaia's disease did not interfere with her job duties and she had no limitations. She never provided any contrary information from her own medical providers. She also never provided any information from them indicating she needed the interlock device or even that she needed to be in an air-conditioned environment 100 percent of the time. Thus, we cannot conclude the District was responsible for any breakdown in the interactive process.

Moreover, the record shows the interactive process between the parties was successful in that the District gave Schwaia several accommodations, including the one she ultimately sought. The successful accommodation of a disability forecloses a claim the employer failed to engage in the interactive process. (*Wilson v. County of Orange*, *supra*, 169 Cal.App.4th at p. 1195, citing *Hanson v. Lucky Stores, Inc., supra*, 74 Cal.App.4th at p. 229, & *Watkins v. Ameripride Services* (9th Cir. 2004) 375 F.3d 821, 829, fn. 5.) Furthermore, because there is no evidence in the record the interlock device was necessary to enable Schwaia to perform the essential functions of her job, she has not established she sustained a remedial injury from any alleged breakdown in the interactive process. (*Scotch v. Art Institute of California*, *supra*, 173 Cal.App.4th at p. 1019 [a

17

plaintiff suffers no remedial injury from the failure to engage in the interactive process unless the requested accommodation was reasonable and directed to the limitations created by the employee's disability.].)  Consequently, we cannot conclude the court erred in finding the District did not fail to engage in the interactive process with Schwaia.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

McCONNELL, P. J.

WE CONCUR:

AARON, J.

IRION, J.

18