Filed 4/14/14  Vasquez v. Pitzer College CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| EDITH VASQUEZ, | B246426 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC449957) |
| v. | |
| PITZER COLLEGE, | |
| Defendant and Respondent. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Mel Red Recana, Judge.  Affirmed.

        Law Offices of James P. Stoneman II and James P. Stoneman II for Plaintiff and Appellant.

        Best Best & Krieger, Arlene Prater, and Sara R. Lustig for Defendant and Respondent.

_____

Appellant Edith Vasquez was employed as an Assistant Professor at respondent Pitzer College under a three-year contract. After her contract was not renewed for a second term, Vasquez filed suit against Pitzer alleging claims for sexual harassment and retaliation in violation of the California Fair Employment and Housing Act, Gov. Code § 12900 et seq. (FEHA), and wrongful termination in violation of public policy. Vasquez specifically alleged that a senior professor who participated in her contract review subjected her to quid pro quo and hostile work environment harassment, and that Pitzer decided to not renew her contract in retaliation for reporting the sexual harassment and advocating for the rights of disabled students. The trial court granted summary judgment in favor of Pitzer and dismissed each cause of action in Vasquez's complaint. We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**I.    Overview of Pitzer College**

**A.    Faculty Governance**

Pitzer is a private four-year liberal arts college and one of seven educational institutions that comprise the Claremont Colleges. The terms and conditions of employment for faculty members are contained in Pitzer's Bylaws and Faculty Handbook. Faculty members are organized into Field Groups, which are composed of faculty members holding contractual appointments in a particular discipline and other faculty members with related interests as determined under the governing procedures. The Dean of Faculty oversees faculty recruitment and development and provides assistance to the governance committees. The President is responsible for the general supervision of faculty and administrators and performs all duties customarily performed by college presidents. At all relevant times, Laura Trombley was Pitzer's President, Alan Jones was the Dean of Faculty, Jim Marchant was the Dean of Students, and Yuet Lee was the Vice President of Administration.

2

## B. Contract Renewal Policies and Procedures

As set forth in Pitzer's Bylaws and Faculty Handbook, tenure-track faculty members are hired on an initial three-year contract. They are then subject to a review under specified procedures to determine whether their contract should be renewed for a second three-year term. The criteria for contract renewal fall into three categories: (1) teaching and academic advising; (2) scholarly and artistic activities; and (3) service to Pitzer and other communities. The procedures for a contract renewal include notifying the faculty member and his or her peers and students of the upcoming review and forming an Ad Hoc Committee to gather specified information and documents.

The Ad Hoc Committee consists of three faculty members who are appointed by the Appointments, Promotion, and Tenure (APT) Committee. One member of the Ad Hoc Committee is also a member of the APT Committee, the second is normally from the same or related field as the faculty member under review, and the third is from an unrelated field. The faculty member has the right to refuse two of the Ad Hoc Committee members chosen by the APT Committee prior to the review. The Ad Hoc Committee collects, compiles, and reviews the information and documents provided by the faculty member and his or her peers and students, and then submits a written report summarizing its review to the APT Committee. The Ad Hoc Committee does not make any recommendations concerning the faculty member under review.

The APT Committee is comprised of six faculty members elected by eligible faculty, two students, the Dean of Faculty, and the President, who is the sole non-voting member. The APT Committee is responsible for advising and making recommendations to the President on matters of faculty appointments, contract renewal, promotion, and tenure, and review of tenured faculty members. In a contract renewal matter, the APT Committee reviews the Ad Hoc Committee's report and attached documents as well as any additional documents identified in the Faculty Handbook's contract renewal policy. The APT Committee then makes a written recommendation to the President whether to renew the faculty member's contract for a second three-year term.

After receiving a copy of the APT Committee's decision, the faculty member can file an appeal with the President, who can request that the APT Committee reconsider its recommendation. The President then decides whether to uphold the recommendation of the APT Committee. If the faculty member's contract is renewed, he or she is subject to another review at the end of the second three-year term to determine whether the faculty member should be granted tenure. If the contract is not renewed, Pitzer offers the faculty member a terminal one-year contract under terms that can include teaching assignments and/or paid leave during one or both semesters.

### C. Sexual Harassment Policies and Procedures

Pitzer has a written sexual harassment policy applicable to students, faculty, and staff. The policy provides that an individual who wishes to file a complaint of sexual harassment is to report the alleged conduct to the Dean of Students, the Dean of Faculty, or the Director of Human Resources. If a complaint cannot be resolved informally, the policy provides for a full, impartial, and timely investigation by a Hearing Committee. The Hearing Committee is comprised of three faculty members, one staff member, and one student, each of whom receives training on handling sexual harassment complaints, and must include at least two females and two males. At the conclusion of its investigation, the Hearing Committee prepares a written report detailing the allegations, evidence, persuasiveness of the evidence, consistency of the testimony, and credibility of the witnesses, and determines whether there has been a violation of the sexual harassment policy. The report is then submitted to a designated Pitzer Vice President for a final determination, which can be appealed to the President.

## II. Vasquez's Spring 2009 Contract Renewal Review

Vasquez was hired by Pitzer in a tenure-track position on a three-year contract effective July 1, 2006. She was employed as an Assistant Professor in the English and World Literature (EWL) Field Group. Vasquez was reviewed for contract renewal in Spring 2009. The APT Committee appointed Professors Judith Grabiner (chair and APT voting member), Linus Yamane (at-large representative), and Ntongela Masilela

4

(academic discipline representative) to the Ad Hoc Committee for Vasquez's contract review. In November 2008, prior to her review, Vasquez was notified that she could object to two of these Ad Hoc Committee members; she did not challenge any member.

The Ad Hoc Committee conducted interviews with Vasquez, faculty members, and students, and reviewed numerous written statements and materials provided by these individuals, including teacher evaluations, student evaluations, and all documents submitted by and on behalf of Vasquez. On April 9, 2009, the Ad Hoc Committee submitted a written report with attachments to the APT Committee. The APT Committee reviewed the Ad Hoc Committee's report and the additional information identified in the Faculty Handbook, and considered Vasquez based on the three performance criteria required for a contract renewal. The nine voting members of the APT Committee voted unanimously to recommend that Vasquez's contract not be renewed for a second three-year term based on their determination that her performance did not meet Pitzer's standards.[1] On May 1, 2009, the APT Committee notified Vasquez of its decision.

On May 15, 2009, Vasquez appealed the APT Committee's decision to the President, who asked the APT Committee to reconsider its decision to address certain issues raised by Vasquez in her appeal.[2] On June 19, 2009, the APT Committee provided

---

[1]     In a letter to Pitzer's President, the APT Committee described the basis for its decision as follows: "Based on the evidence presented to us, we conclude that Professor Vasquez does not meet the standards in the categories of teaching and advising, scholarship, and service necessary to warrant renewal of her contract. Student reports about her teaching, in response to the core questions and in course evaluations, point consistently to a series of troubling issues: that her courses are not challenging, that they are disorganized, and that many of her students say that they are not learning. Furthermore, we believe that her performance in these categories is unlikely to rise to a level sufficient to earn tenure were she to remain at the college for another three years. Accordingly, the committee voted against recommending renewal of her contract."

[2]     The President specifically asked the APT Committee to address Vasquez's claims that certain information was not available to the APT Committee during its review, that the information which was presented contained errors, and that improper procedures were followed.

5

a written response to the President's request for reconsideration in which it concluded that it had considered all pertinent information and had followed the procedures outlined in the Faculty Handbook. The President decided to uphold the recommendation of the APT Committee, and on June 29, 2009, informed Vasquez that her contract would not be renewed. In accordance with its policy, Pitzer offered Vasquez a terminal one-year contract for the 2009-2010 academic year, which provided that she would teach for one semester and could take a paid sabbatical leave the next semester. On July 28, 2009, Vasquez signed the one-year contract.

## III. Vasquez's Support of Certain Students with Disabilities

In 2008 and 2009, Vasquez provided assistance to two student advisees with disabilities. One of the students, who had autism, was called to a meeting at the Office of Student Affairs after one or two faculty members complained about the student's body odor, which was caused by a medication he was taking. In a March 2008 email to Jim Marchant, the Dean of Student Affairs, Vasquez expressed concern that the student had been summoned to the dean's office, and she asked that she be consulted whenever her advisees were approached about personal matters pertaining to the classroom. In an email reply to Vasquez, Dean Marchant explained that his office had acted quickly in response to the faculty member's complaint because it was a health and hygiene issue. He agreed that his office should have spoken to Vasquez first about the situation and would do so in the future, and told her that it was "heartening to know that you are so supportive of your advisees . . . in and out of the classroom." An Associate Dean also apologized to Vasquez in person about how the situation with the student was handled.

The other student, who had multiple sclerosis, needed a medical appointment at the student health office, which had not received all of the proper paperwork for her. Vasquez assisted the student in obtaining the necessary medical form from the Office of Student Affairs. In a September 2009 email to the student, which was copied to Alan Jones, the Dean of Faculty, Vasquez expressed concern that Pitzer "has not been attuned to proper medical documentation," and suggested that "structural barriers" at the college

6

might be preventing the student from achieving excellence as a "young Black woman with a medical disability." In response to Dean Jones's offer of assistance, the student stated in an email to the dean that there had been a "deep misunderstanding," that she did not know why Vasquez thought she was unhappy with the support she had been receiving at Pitzer, and that she did not feel her illness had anything to do with her level of support. Vasquez did not inform any members of the APT Committee that she had in any way assisted these two students.

## IV.     Vasquez's September 2009 Sexual Harassment Complaint

On or about September 1, 2009, Vasquez reported to Pitzer for the first time that she believed she had been sexually harassed by Professor Masilela between December 2008 and May 2009. Masilela was a member of the Ad Hoc Committee for Vasquez's contract renewal review and had been a member of Vasquez's EWL Field Group; however, he was not in the EWL Field Group at the time of the contract review or the alleged harassment. Upon receiving Vasquez's sexual harassment complaint, Dean Jones advised Vasquez in writing that Pitzer needed additional information about her complaint to proceed with an investigation.

In a September 16, 2009 written statement to Pitzer, Vasquez made the following allegations about Masilela: (1) on December 12, 2008, after changing a scheduled lunch meeting to discuss Vasquez's upcoming contract review to a dinner meeting, Masilela picked her up from her home, made a brief stop at his home, and then took her for a long walk and to a restaurant for dinner; at the restaurant, Masilela told Vasquez that he was in love with her and that she should choose a lover between him and another professor, made a "polygamous marriage" proposition to her, and became angry when she rejected his proposition; (2) on March 6, 2009, after a presentation at Pitzer, Masilela verbally "forced" Vasquez to go with him to Los Angeles for dinner and a visit to a bookstore, and after a "more than 3 hour date," he "lunged" at her and tried to, but did not, kiss her; prior to leaving for the date, Masilela told Vasquez that he had been informed by the dean that Pitzer was dropping a separate special review into student complaints about her teaching;

7

(3) on March 17, 2009, Masilela went to Vasquez's home while she was out, asked her son to call her to find out where she was, and then "interrogated" her over the telephone on her whereabouts; (4) on May 6, 2009, Masilela told Vasquez in a telephone conversation that he could not vociferously support her in her contract review or he would lose credibility, and that some members of the review committee had doubts about her; (5) during the Spring 2009 semester, Masilela "monitored" Vasquez on and off campus, such as telling her on one occasion that he had driven by her home the night before and saw that her car was not there; and (6) Masilela made comments about Vasquez's appearance, clothing, and age at work while providing her with guidance and information related to her contract review.

During her deposition testimony in this case, Vasquez also asserted that: (1) between December 2008 and March 2009, Masilela asked Vasquez if two colleagues were having sex; (2) between March and May 2009, Masilela often telephoned Vasquez at her home but she did not answer his calls; (3) during a discussion about a dean's report on Vasquez's teaching, which Vasquez felt contained false charges of incompetence, Masilela mimicked inserting the document into her contract review file; (4) during a discussion about Vasquez's teaching abilities, Masilela hit a wall with the edge of his hand and told her that she needed to admit to problems with her teaching; (5) shortly before the start of the Fall semester, Masilela once rubbed Vasquez's arm for one or two seconds; (6) Masilela told Vasquez that she was beautiful and had a beautiful jacket; and (7) in December 2008, Masilela told Vasquez that he had made "extraordinary sacrifices" at the time of his contract review and that she also would have to make "extraordinary sacrifices" to be promoted.

After receiving Vasquez's September 16, 2009 statement, Dean Jones immediately informed Masilela that he was to have no contact with Vasquez and Masilela agreed that he would not. There was no evidence that Masilela had any contact with Vasquez at any time after that directive was made. Dean Jones also promptly referred Vasquez's complaint to the chairperson of the Sexual Harassment Committee, beginning the investigative process. A five-member Hearing Committee was appointed to conduct a

8

full investigation into Vasquez's complaint. The Hearing Committee received written statements and supporting documents submitted by the parties and conducted interviews with Vasquez, Masilela, and other relevant witnesses. On November 17, 2009, after completing its investigation, the Hearing Committee issued a written report in which it determined that there was insufficient evidence to find that Masilela had violated Pitzer's sexual harassment policy and recommended that no further action be taken at that time. The report was then submitted to Yuet Lee, Pitzer's Vice President of Administration, who upheld the Hearing Committee's decision. Vasquez did not appeal the decision to Pitzer's President.

## V.    Pitzer's October 2009 Decision to Place Vasquez on Paid Leave

In late October 2009, several students from one of Vasquez's classes complained to the Dean of Faculty's office that, among other issues with the course, Vasquez had failed to appear for roughly one-third of her scheduled classes that semester. Dean Jones notified Vasquez of these student concerns and also advised her that he would be bringing the matter to the attention of the Faculty Executive Committee, which oversees grievances by and against faculty members. At its October 30, 2009 meeting, the Faculty Executive Committee was informed about the specifics of the students' complaints, and after reviewing the matter, was sufficiently concerned with the situation in Vasquez's classes that it elected to place her on a fully paid administrative leave for the remainder of the Fall 2009 semester. Vasquez remained on paid leave through the Spring 2010 semester in accordance with her terminal one-year contract. In June 2010, Vasquez's contract expired and her employment with Pitzer ended.

## VI.    Vasquez's Lawsuit Against Pitzer

In November 2010, Vasquez filed suit against Pitzer. Her complaint asserted two causes of action: (1) statutory violation of the FEHA, and (2) wrongful termination in violation of public policy. For each cause of action, Vasquez specifically alleged that Pitzer had subjected her to unlawful gender discrimination, hostile work environment sexual harassment, quid pro quo sexual harassment, and retaliation for reporting sexual

9

harassment and advocating for the rights of disabled students. She sought compensatory and punitive damages, and attorney's fees.

In July 2012, Pitzer filed a motion for summary judgment, or in the alternative, summary adjudication. In her opposition, Vasquez voluntarily withdrew her claims for gender discrimination and punitive damages. Of the 408 material facts set forth in Pitzer's separate statement, Vasquez disputed only four alleged facts.[3] Vasquez submitted four additional disputed "facts," which reflected the ultimate issues in the case rather than evidentiary facts.[4] She also relied solely on the evidence produced by Pitzer in support of its motion without offering any further evidence in her opposition.

On October 9, 2012, the trial court granted summary judgment in favor of Pitzer. With respect to Vasquez's claims for sexual harassment, the trial court found that Pitzer had met its burden of establishing that Vasquez was not subjected to either quid pro quo or hostile work environment harassment, and that Vasquez had failed to demonstrate the existence of a triable issue of material fact as to either claim. With respect to Vasquez's claims for retaliation, the trial court found that Vasquez could not state a prima facie case of retaliation because she could not show a causal connection between her protected activity and Pitzer's decision to not renew her contract for a second term. The trial court also found that, because Vasquez's cause of action for violation of the FEHA failed as a matter of law, her cause of action for wrongful termination in violation of public policy

---

[3] The four material facts which Vasquez disputed concerned the Faculty Executive Committee's stated reasons for placing her on administrative leave in October 2009, and Dean Jones's denial that he took any action regarding Vasquez's employment based on her gender or in retaliation for her protected activity. Vasquez objected to each of these alleged facts as "state of mind testimony" insufficient to support a summary judgment motion under Code of Civil Procedure section 437c, subdivision (e).

[4] The four additional "facts" submitted by Vasquez were as follows: (1) "Whether Plaintiff was exposed to Quid Pro Quo sexual harassment by Masilela"; (2) "Whether Plaintiff was exposed to hostile work environment sexual harassment by Masilela"; (3) "Whether Pitzer is strictly liable for the sexual harassment of Plaintiff by Masilela"; and (4) "Whether Pitzer and/or Masilela retaliated against Plaintiff after she made her sexual harassment complaint."

10

likewise failed.  Following the trial court's entry of judgment in favor of Pitzer, Vasquez filed a timely notice of appeal.

**DISCUSSION**

**I.      Standard Of Review**

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)  "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.*, *supra*, at p. 850.)  The party opposing summary judgment "may not rely upon the mere allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).)  A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.*, *supra*, at p. 850.)

We review the trial court's ruling de novo.  (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 860.)  We consider all the evidence presented by the parties in connection with the motion (except that which was properly excluded) and all the uncontradicted inferences that the evidence reasonably supports.  (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)  We affirm a summary judgment where it is shown that no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)

**II.     Sexual Harassment in Violation of FEHA**

In her cause of action for violation of the FEHA, Vasquez alleged that, among other acts, she was subjected to both quid pro quo and hostile work environment sexual harassment by Masilela.  In moving for summary judgment, Pitzer argued that these claims failed as a matter of law because none of the conduct alleged by Vasquez rose to

11

the level of actionable sexual harassment, and even if it did, Pitzer took prompt remedial action upon receiving Vasquez's complaint of harassment by a nonsupervisory employee. We conclude that, even assuming Masilela's conduct constituted actionable harassment, the undisputed evidence established that (1) Masilela was not Vasquez's supervisor within the meaning of the FEHA, and (2) Pitzer took immediate and appropriate corrective action in response to Vasquez's complaint. Pitzer accordingly cannot be held liable for the alleged sexual harassment as a matter of law.[5]

## A.    Governing Legal Principles

The FEHA makes it an unlawful employment practice for an employer, "because of . . . sex, . . . to harass an employee." (Gov. Code, § 12940, subd. (j)(1).) "Under the statutory scheme, '"harassment" because of sex' includes sexual harassment and gender harassment. [Citation.]" (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277.) "With respect to sexual harassment in the workplace [citation], the prohibited conduct ranges from expressly or impliedly conditioning employment benefits on submission to, or tolerance of, unwelcome sexual advances to the creation of a work environment that is 'hostile or abusive to employees because of their sex.' [Citation.] Thus, similar to the federal law's Title VII, California's FEHA 'recognize[s] two theories of liability for sexual harassment claims… "… quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances … [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the

---

[5]    The trial court granted summary adjudication on the sexual harassment claims based on its finding that the conduct alleged by Vasquez did not constitute actionable quid pro quo or hostile work environment harassment as a matter of law. Although the trial court made its ruling on a different ground, supplemental briefing is not required under Code of Civil Procedure section 437c, subdivision (m)(2) because the ground on which we rely was raised in the trial court and has been briefed on appeal. (*Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147, fn. 7.) Nonetheless, we advised the parties by letter of their right to submit further briefing on this issue.

12

conditions of employment and create an abusive work environment."' [Citations.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1042-1043.)

"The FEHA imposes two standards of employer liability for sexual harassment, depending on whether the person engaging in the harassment is the victim's supervisor or a nonsupervisory coemployee." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1040-1041.) An employer is liable for sexual harassment by a nonsupervisory coemployee "only if the employer (a) knew or should have known of the harassing conduct and (b) failed to take immediate and appropriate corrective action. [Citation.] This is a negligence standard." (*Id.* at p. 1041; see also Gov. Code, § 12940, subd. (j)(1) ["Harassment of an employee … by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."].) On the other hand, "an employer is strictly liable for *all* acts of sexual harassment by a supervisor." (*State Dept. of Health Services v. Superior Court*, *supra*, at p. 1042; see also *Carrisales v. Department of Corrections* (1999) 21 Cal.4th 1132, 1136-1137, superseded by statute on other grounds as stated in *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 471 [FEHA "makes the employer strictly liable for harassment by an agent or supervisor"].) The FEHA specifically defines the term "supervisor" as "any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (Gov. Code, § 12926, subd. (t).)

To avoid liability for sexual harassment by a nonsupervisory coemployee, an employer must take "prompt, reasonable and efficacious remedial action" in response to a harassment complaint. (*Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1185.) "The employer's obligation to take prompt corrective action requires (1) that temporary steps be taken to deal with the situation while the employer determines whether the

13

complaint is justified and (2) that permanent remedial steps be implemented by the employer to prevent future harassment once the investigation is completed. [Citation.] An employer has wide discretion in choosing how to minimize contact between the two employees, so long as it acts to stop the harassment. [Citation.] '[T]he reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment.' [Citation.]" (*Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1631.)

"[T]he 'most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified. An investigation is a key step in the employer's response. . . .' [Citation.]" (*Bradley v. Department of Corrections & Rehabilitation*, *supra*, 158 Cal.App.4th at p. 1631.) A prompt reasonable investigation of a harassment complaint may satisfy the employer's obligation even if the investigation reveals no evidence that the accused employee actually committed harassment. (*Mathieu v. Norrell Corp.*, *supra*, 115 Cal.App.4th at p. 1185; see also *Baldwin v. Blue Cross/Blue Shield* (11th Cir. 2007) 480 F.3d 1287, 1303 ["[t]he requirement of a reasonable investigation does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser"]; *Swenson v. Potter* (9th Cir. 2001) 271 F.3d 1184, 1196 ["the employer can act reasonably, yet reach a mistaken conclusion as to whether the accused employee actually committed harassment"].)

## B. Application to Vasquez's Sexual Harassment Claims
### 1. Masilela's Status as a Non-Supervisory Employee
Pitzer's liability for the alleged sexual harassment of Vasquez by Masilela first turns on whether Masilela was Vasquez's supervisor within the meaning of the FEHA. In support of its motion for summary judgment, Pitzer presented undisputed evidence that faculty at the college are organized into Field Groups, which are comprised of faculty members holding contractual appointments in a related discipline with no chairperson or other member in charge of the Field Group. Masilela was a full professor in Vasquez's

14

EWL Field Group at the time of her hire as an Assistant Professor, but he moved to a different Field Group prior to Vasquez's contract review and the alleged harassment. Pitzer also presented undisputed evidence that Masilela was a member of the three-person Ad Hoc Committee, which was responsible for collecting, compiling, and reviewing specified documents and information for Vasquez's contract review. In accordance with Pitzer's contract renewal policy, the Ad Hoc Committee prepared a detailed written report summarizing its review for the APT Committee, but made no recommendation concerning the renewal of Vasquez's contract. The APT Committee (of which Masilela was not a member) voted unanimously to recommend that Vasquez's contract not be renewed, and Pitzer's President ultimately decided to uphold that recommendation.

At her deposition, Vasquez testified that she believed Masilela was her supervisor because he was a "senior long standing member of the English Department and [she] was a new hire in the English Department," and because he was one of the "tenured professors in the field in which [she held] duties of teaching." Although Vasquez's EWL Field Group did provide the Ad Hoc Committee with a written evaluation of her performance for her contract review, it is undisputed that the APT Committee was the decision-making body responsible for determining whether to renew her contract. It is also undisputed that Masilela was no longer a member of the EWL Field Group at the time of the alleged harassment or the contract review, and that he did not participate in the EWL Field Group's evaluation of Vasquez's performance. Additionally, there was no evidence that Masilela ever had the authority to assign, award, discipline, or discharge Vasquez, or the responsibility to direct any of her work. The mere fact that Masilela was a tenured professor in the same field as Vasquez was insufficient to raise a triable issue as to whether Masilela was her supervisor.

On appeal, Vasquez argues that Masilela acted as a supervisor for purposes of the FEHA because he was "a member of the Ad Hoc Committee which was to determine the outcome of [her] review." If, in his capacity as an Ad Hoc Committee member, Masilela had the authority "effectively to recommend" to the APT Committee that Vasquez's contract not be renewed, then he could meet the definition of a supervisor under the

statute. (Gov. Code, § 12926, subd. (t).) However, Pitzer's contract renewal policy expressly provides that "[t]he ad hoc review committee shall make no recommendation concerning the faculty member under review." Rather, the Ad Hoc Committee's role in the contract review process is to act as a fact-gathering committee and to "prepare a written report summarizing all its procedures and findings in relation to the criteria" set forth in the policy for a faculty member's contract review. The report that Masilela and the other Ad Hoc Committee members prepared for Vasquez's contract review adhered to Pitzer's policy. It provided a detailed summary of the interviews, written statements, and other documents obtained from Vasquez, her peers, and her students, and did not include any recommendations or findings as to whether Vasquez's contract should be renewed. While Vasquez speculates that Masilela could have influenced the outcome of her contract review by virtue of his membership on the Ad Hoc Committee, she offered no evidence to show that Masilela ever made any recommendation concerning her employment to the APT Committee or that he had the authority to do so. Based on the undisputed factual record, Masilela was not Vasquez's supervisor within the meaning of the FEHA.

### 2. Pitzer's Prompt Remedial Response to the Alleged Harassment

Because Masilela was not Vasquez's supervisor, Pitzer's liability for the alleged sexual harassment of Vasquez next turns on whether the college took immediate and appropriate corrective action once it knew or had reason to know of the purported conduct. The record reflects that the alleged harassment occurred between December 2008 and May 2009. It is undisputed that Pitzer had a written sexual harassment policy with a detailed complaint procedure in place at that time, and that Vasquez was familiar with the policy and the procedure for filing a harassment complaint. It is also undisputed that the first time Vasquez reported the alleged harassment to Pitzer was on or about September 1, 2009, when she informed a member of the Dean of Faculty's office that she was experiencing hostility and harassment at work, but did not identify the perpetrator. The following day, Dean Jones sent Vasquez a letter reminding her of Pitzer's

16

harassment policy and requesting more specific information about her report so that the college could investigate and take appropriate action. On September 13, 2009, Dean Jones sent Vasquez a follow-up email explaining that Pitzer wanted to address her complaint as quickly as possible but still needed additional information from her to proceed. On September 16, 2009, Vasquez responded to Dean Jones's request for information with a written statement describing Masilela's alleged acts of harassment.

The undisputed facts further showed that, upon receipt of Vasquez's written statement, Dean Jones immediately informed Masilela that he was to have no contact with Vasquez and Masilela agreed that he would not. Dean Jones also immediately forwarded the complaint to the chairperson of the Sexual Harassment Committee, which initiated the investigative process by forming a five-person Hearing Committee to fully investigate Vasquez's allegations. As Vasquez herself conceded, the Hearing Committee conducted a thorough investigation of her sexual harassment complaint, including receiving written statements and supporting documents from the parties and interviewing Vasquez, Masilela, and other relevant witnesses. On November 17, 2009, approximately two months after its initial receipt of Vasquez's complaint, the Hearing Committee issued a detailed written report in which it determined that there was insufficient evidence to find that Masilela had violated Pitzer's sexual harassment policy. While noting that Masilela should be advised to review Pitzer's training materials on mentoring relationships, the Hearing Committee did not recommend any further corrective action at that time. Pitzer's Vice President of Administration promptly upheld the Hearing Committee's decision, and Vasquez did not exercise her right to appeal to Pitzer's President.

On appeal, Vasquez does not claim that Pitzer knew or should have known of the alleged sexual harassment at any time prior to her September 2009 complaint. Nor does she contend that, once Pitzer was informed of the alleged harassment, the college failed to take immediate and appropriate corrective action. Indeed, the undisputed factual record demonstrated that Pitzer did take prompt remedial action by immediately instructing Masilela to have no further contact with Vasquez and convening a Hearing

17

Committee to thoroughly investigate her complaint. Although the Hearing Committee ultimately determined that the evidence was insufficient to find a violation of the sexual harassment policy, Pitzer took appropriate steps to ensure that any alleged unwelcome conduct by Masilela ended by issuing the no-contact instruction to him. There was no evidence that Masilela had any contact with Vasquez following her complaint to Pitzer or that Vasquez remained at risk of any future harassment unless further corrective action was taken. (See, e.g., *Swenson v. Potter*, *supra*, 271 F.3d at p. 1196 [where employer concluded "it had insufficient evidence to sustain a charge of harassment, [it] had an entirely legitimate reason for declining to discipline [the alleged harasser] and resorting to other methods of remedying the situation"]; *Ryczek v. Guest Services, Inc.* (D.D.C. 1995) 877 F.Supp. 754, 760 ["an employer . . . does not have to necessarily discipline or terminate the offending employee as long as the employer takes corrective action reasonably likely to prevent the offending conduct from reoccurring"].)

For these reasons, even if we assume that Masilela's conduct rose to the level of actionable sexual harassment, Pitzer is not liable for the harassment as a matter of law because it took immediate and appropriate remedial action in response to Vasquez's complaint. Pitzer was therefore entitled to summary adjudication on Vasquez's claims for quid pro quo and hostile work environment harassment in violation of the FEHA. (*Mathieu v. Norrell Corp.*, *supra*, 115 Cal.App.4th at p. 1185 [summary adjudication was proper on sexual harassment claim where employer was not aware of harassment until it had ceased and conducted a prompt investigation upon receiving plaintiff's complaint.])

## III.    Retaliation in Violation of FEHA

In her cause of action for violation of the FEHA, Vasquez also alleged that Pitzer retaliated against her for (1) reporting the sexual harassment perpetrated by Masilela, and (2) advocating for the rights of disabled students. In its summary judgment motion, Pitzer asserted that Vasquez could not state a prima facie case of retaliation, and even if she could, she failed to present substantial evidence that Pitzer's proffered reasons for its employment decisions were pretext for unlawful retaliation. We conclude that Vasquez

18

cannot establish a prima facie case of retaliation because the undisputed evidence showed the absence of any causal connection between Vasquez's protected activities and Pitzer's adverse employment decisions. Vasquez's retaliation claims thus fail as a matter of law.

### A. Governing Legal Principles

Under the FEHA, it is an unlawful employment practice for "any employer … or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h).) When a plaintiff alleges retaliation either as a statutory claim under the FEHA or as a common law claim for wrongful termination in violation of public policy, California courts apply the three-step burden-shifting analysis of *McDonnell Douglas Corp. v Green* (1973) 411 U.S. 792 to evaluate the claim on summary judgment. (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109.) "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

"'The retaliatory motive is "proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter." [Citation.] "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment

19

decision.'" [Citation.]' [Citation.]" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69-70.) Proof of intentional discrimination or retaliation often depends on circumstantial evidence because it consists of "subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713.) Nevertheless, "[t]he central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus." (*Id.* at p. 715.)

### B. Application to Vasquez's Retaliation Claims

### 1. Sexual Harassment Complaint

Vasquez alleged that Pitzer decided to not renew her contract for a second term in retaliation for her complaining about the sexual harassment by Masilela. It is undisputed, however, that Vasquez did not report the alleged harassment to anyone at Pitzer until September 2009, months after the APT Committee recommended that Vasquez's contract not be renewed and Pitzer's President decided to uphold that recommendation. Because Vasquez did not complain about the sexual harassment until well after Pitzer decided to not renew her contract, she cannot demonstrate the requisite causal connection to support a retaliation claim under this theory. (*Morgan v. Regents of University of California*, *supra*, 88 Cal.App.4th at p. 70 ["'[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity'"].)

On appeal, Vasquez does not dispute that the contract renewal decision was made prior to her sexual harassment complaint. Instead, she contends that there are triable issues of fact as to whether the perpetrator of the alleged harassment, Masilela, used his membership on the Ad Hoc Committee to adversely influence the outcome of her contract review in retaliation for her refusal to submit to his sexual advances. However, as discussed above, Vasquez did not present any evidence to support her claim that Masilela influenced, or even attempted to influence, any of the individuals involved in deciding whether her contract should be renewed. Rather, the undisputed evidence

established that Masilela's role in the contract review process was limited to serving on the three-person Ad Hoc Committee, which acted solely as a fact-gathering committee and did not make any recommendation concerning Vasquez's continued employment at Pitzer. There was no evidence that Masilela provided any other input to Pitzer for Vasquez's contract review or made any effort to adversely influence the actual decision-makers through his membership on the Ad Hoc Committee. Given these undisputed facts, Vasquez cannot make a prima facie showing of retaliation based on her sexual harassment complaint.

### 2. Disability Rights Advocacy

Vasquez also alleged that Pitzer retaliated against her because she advocated for the rights of two students with disabilities. This claim also fails because there was no evidence that anyone involved in Pitzer's decision to not renew her contract had any knowledge of Vasquez's alleged advocacy. At her deposition, Vasquez testified that she believed she was subjected to retaliation for her disability rights activities because it was patronizing for the administrators involved in these matters to thank her as they did for assisting the two students. However, the administrator who thanked Vasquez for her assistance was Dean Marchant, the Dean of Student Affairs, who had no involvement in Vasquez's contract review. Vasquez further admitted that she did not inform any of the decision-makers in her contract review about her efforts to assist these students.[6] She also could not recall anyone at Pitzer making any adverse statements about her helping students with disabilities and admitted that she received only praise for doing so. Based on the undisputed evidence, Vasquez cannot establish a causal link between her alleged

---

[6] The record reflects that Dean Jones, the Dean of Faculty and voting member of the APT Committee, was copied on a September 2009 email that Vasquez sent to one of the students that she assisted. However, the email was sent months after Pitzer's decision to not renew her contract and made only a vague reference to the student's disability.

advocacy and Pitzer's adverse employment decisions. Pitzer accordingly was entitled to summary adjudication on Vasquez's claims for retaliation in violation of the FEHA.[7]

## IV.    Wrongful Termination in Violation of Public Policy

In her cause of action for wrongful termination in violation of public policy, Vasquez alleged that Pitzer terminated her employment in retaliation for her sexual harassment complaint and advocacy on behalf of disabled students. The record reflects that Vasquez's public policy claim is based on the same factual allegations and legal theories supporting her statutory retaliation claims, and therefore, rises and falls with her cause of action for violation of the FEHA. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229 [where plaintiff's "FEHA claim fails, his claim for wrongful termination in violation of public policy fails"].)  Because we conclude that Vasquez cannot state a prima facie case of retaliation in violation of the FEHA as a matter of law, she likewise cannot establish a prima face case of wrongful termination in violation of public policy. The trial court properly granted summary judgment.

### DISPOSITION

The judgment is affirmed. Pitzer shall recover its costs on appeal.

ZELON, J.

We concur:

WOODS, Acting P. J.          SEGAL, J.[*]

---

[7]    In ruling on Pitzer's summary judgment motion, the trial court did not address the merits of Vasquez's claim for retaliation based on her alleged disability rights advocacy because it erroneously concluded that such theory was not set forth in her complaint. In light of our holding that Vasquez cannot state a prima facie case of retaliation as a matter of law, any such error by the trial court was harmless.

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22