Filed 10/6/20  Bailey v. San Francisco Dist. Attorney's Office CA1/1

THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TWANDA BAILEY,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE et al.,<br><br>　　　Defendants and Respondents. | A153520<br><br>(San Francisco County Super. Ct. No. CGC-15-549675) |

THE COURT:

On our own motion, we modify the opinion in this case by adding at page 20, at the end of the first sentence, the following footnote:

"Bailey claimed the trial court likewise erred in concluding she could not prevail on her cause of action for failure to prevent discrimination, harassment or retaliation under section 12940, subdivision (k) because she 'does have viable claims . . . [for] unlawful harassment and retaliation.' '[C]ourts have required a finding of actual discrimination or harassment under FEHA before a plaintiff may prevail under section 12940, subdivision (k).' (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925, fn. 4.) Because we have concluded there is no triable issue regarding Bailey's discrimination, harassment and retaliation causes of action, there is likewise no triable issue as to her cause of action for failure to prevent discrimination, harassment or retaliation."

There is no change in the appellate judgment.

Appellant Twanda Bailey's petition for rehearing is denied.

1

Date:___10/6/20_____   _____HUMES, P.J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TWANDA BAILEY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE et al.,<br><br>    Defendants and Respondents. | A153520<br><br>(San Francisco City & County Super. Ct. No. CGC-15-549675) |

Following a co-worker's alleged use of a highly offensive racial epithet, plaintiff Twanda Bailey filed suit under the Fair Employment and Housing Act (FEHA)[1] against the San Francisco District Attorney's Office (DA's Office) and the City and County of San Francisco (City), alleging causes of action for discrimination and harassment, failure to prevent discrimination, and retaliation.  She appeals from the grant of a defense summary judgment. We affirm.

## BACKGROUND

Bailey commenced employment with the DA's Office in 2001.  In 2011, she was promoted to a "class 8132 Investigative Assistant," working in the

---

[1] Government Code section 12940, et seq.  All further statutory references are to the Government Code, unless otherwise indicated.

1

records room. Saras Larkin, also an investigative assistant, worked next to Bailey.

Bailey claims that in January 2015, after a mouse ran through the records room and startled her, Larkin said " 'You niggers is so scary.' " Bailey was deeply offended and left the records room to calm down. Outside, she encountered three co-workers who asked her what was wrong, and Bailey told them about the incident. She did not, however, report it to the human resources office because she feared retaliation, given Larkin's close relationship with Human Resources Director Evette Taylor-Monachino.

The next day, at on offsite office social gathering, Bailey's supervisor Alexandra Lopes overheard a conversation about the incident. Lopes asked Bailey if she had reported it. When Bailey said she had not, Lopes said she would notify human resources.

A few days later, Assistant Chief of Finance Sheila Arcelona asked Bailey to meet with her and Taylor-Monachino. Arcelona reported to Chief Administrative and Financial Officer Eugene Clendinen who, in turn, reported directly to the District Attorney.

Arcelona took Bailey's statement, and thereafter she and Taylor-Monachino met with Larkin, who denied making the remark. Arcelona told Larkin " 'that word or any iteration of that word is not acceptable in the workplace.' "

About two months later, Bailey asked Taylor-Monachino for a copy of the report Bailey thought was being prepared about the incident. When Taylor-Monachino told her no report had been prepared, Bailey said she wanted a complaint filed, but Taylor-Monachino refused. Taylor-Monachino also told Bailey that if she discussed the incident with others, she would be

2

creating a hostile working environment for Larkin. Bailey then went on leave for a "few weeks."

In April, Bailey received a letter from the human resources department stating it had received notice of the incident and would be reviewing it. A San Francisco Police Department employee who had heard of the incident had notified the Department.

Bailey maintains that after she returned from leave, Taylor-Monachino treated her differently. According to Bailey, Taylor-Monachino made faces and chuckled at Bailey and refused to speak to her. Bailey later learned Taylor-Monachino had vetoed separating Bailey and Larkin at work.

Bailey also felt she was asked to perform tasks she believed were outside her job description and were normally Larkin's responsibility. Bailey's supervisors, however, perceived that she seemed annoyed and irritated by work requests they considered standard.

In June, Bailey's new supervisor, Irene Bohannon, gave Bailey a performance plan and appraisal report that identified two areas for improvement: "regular attendance, and responsiveness to supervisory requests." However, Bohannon gave Bailey the same overall rating, "Met Expectations," Bailey had received the prior two years.

The following month, the human resources department notified Bailey it would not investigate the complaint because the "allegations are insufficient to raise an inference of harassment/hostile work environment or retaliation."

In August, after Taylor-Monachino, according to Bailey, silently mouthed the words, " 'You are going to get it,' " Bailey filed a harassment complaint with Clendinen.

Three months later, in November, Bailey told Clendinen she was not comfortable covering for Larkin or performing tasks that she believed were Larkin's duties. Clendinen promptly separated Bailey and Larkin, transferring Larkin out of the records room.

The following month, Bailey requested and was granted a six-week medical leave. She subsequently filed the instant action, alleging causes of action under the FEHA for racial discrimination and harassment, retaliation for having made a complaint, and failure to prevent discrimination.

As of June 2017, Bailey remained on leave. In the meantime, Taylor-Monachino's employment with the DA's Office was terminated in May 2017 pursuant to a settlement agreement.

## DISCUSSION

### *Standard of Review*

Our standard of review of a grant of summary judgment is well-settled. "We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) The trial court's stated reasons for granting summary relief are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

"A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (o)(2), (p)(2).) If the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of fact exists as to that cause of action or

4

defense.  In doing so, the plaintiff cannot rely on the mere allegations or denial of his or her pleadings, 'but, instead, shall set forth the specific facts showing that a triable issue of material fact exists. . . .'  (*Id.*, § 437c, subd. (p)(2).)  A triable issue of material fact exists 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' "  (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 864 (*Thompson*), quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

## *Racial Harassment and Discrimination Under the FEHA*

The FEHA prohibits race discrimination, of which harassment is one form.  (§ 12940, subd. (g); *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 129 (*Aguilar*); *Etter v. Veriflo Corp.* (1998) 67 Cal.App.4th 457, 464 (*Etter*).)

"The law prohibiting harassment is violated '[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " '  [Citations.] This must be assessed from the 'perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff.'  [Citation.]  And the issue of whether an employee was subjected to a hostile environment is ordinarily one of fact."  (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 263–264, abrogated on other grounds as stated in *Serri v. Santa Clara University* (2014) 225 Cal.App.4th 830, 853, fn. 12.)  The California Code of Regulations defines harassment to include " '[v]erbal harassment, e.g., epithets, derogatory comments or slurs on a basis enumerated in the [FEHA].' " (*Aguilar*, *supra*, 21 Cal.4th at p. 129.)

To establish a "prima facie case of a racially hostile work environment," a plaintiff must show "(1) he [or she] was a member of a protected class; (2) he [or she] was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the [employer] is liable for the harassment." (*Thompson, supra,* 186 Cal.App.4th at p. 876.)

Thus, even if some racial harassment has occurred, a violation of the FEHA does not occur unless the harassing behavior has resulted in a hostile work environment, both subjectively and objectively. (*Faragher v. City of Boca Raton* (1998) 524 U.S. 775, 786–787.)[2] Racial harassment violates the FEHA when it is " ' " 'sufficiently severe or pervasive to alter the conditions of the victim's employment.' " ' " (*Etter*, *supra*, 67 Cal.App.4th at p. 465, quoting *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 517 (*Beyda*).)

"[T]o prevail on a harassment or hostile work environment claim, the plaintiff 'must establish that . . . the discrimination was severe *or* pervasive.' " (*Castleberry v. STI Group* (3d Cir. 2017) 863 F.3d 259, 263, italics added.) "We have noted that '[t]he difference [between the two standards] is meaningful' because 'isolated incidents (unless extremely serious) will not amount to [harassment].' [Citations.] Indeed, the distinction 'means that "severity" and "pervasiveness" are alternative possibilities: some harassment may be severe enough to contaminate an

---

[2] Racial harassment in the workplace is also actionable discrimination under Title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), the federal counterpart of the FEHA. Accordingly, title VII cases may be considered in interpreting the FEHA, but are not determinative. (*Etter*, *supra*, 67 Cal.App.4th at pp. 464–465; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1051 (*Yanowitz*).)

environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive.' " (*Id.* at p. 264, italics omitted.) In short, " '[n]ot all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment. . . . For . . . harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." [Citation.]' " (*Aguilar, supra*, 21 Cal.4th at p. 130, quoting *Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57, 67.)

With respect to whether harassment has altered the conditions of employment, the California Legislature has recently "affirm[ed] its approval of the standard set forth by Justice Ruth Bader Ginsburg in her concurrence in *Harris v. Forklift Systems* (1993) 510 U.S. 17"—that " 'the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. It suffices to prove that a reasonable person subjected to the discriminatory conduct would find . . . that the harassment so altered working conditions as to make it more difficult to do the job.' (*Id.* at 26.)" (§ 12923, subd. (a).)

### *While Highly Offensive, There Is No Triable Issue the Single Epithet by a Co-worker Altered Bailey's Working Conditions*

Citing *Boyer-Liberto v. Fontainebleau Corp.* (4th Cir. 2015) 786 F.3d 264 (*Boyer-Liberto*), Bailey correctly points out a single racial epithet can be so offensive it gives rise to a triable issue of actionable harassment.[3]

---

[3] Bailey conceded "the only race-related allegation" at issue was Larkin's racial slur. As the trial court recited, it was undisputed Bailey did "not believe that Taylor[-Monachino's] conduct towards her had anything to do with their African-American backgrounds."

7

The plaintiff in *Boyer-Liberto* was an African-American waitress at a hotel. (*Boyer-Liberto*, *supra*, 786 F.3d at p. 268.) She alleged that in a 24-hour period, the food and beverage manager "threatened [her] with the loss of her job," and twice called her a " 'porch monkey.' " (*Id.* at pp. 268–270.) After she reported the incidents to the company's human resources director, she was fired. (*Id.* at p. 270.) She sued, asserting claims for hostile work environment and retaliation. The district court granted summary judgment in favor of the hotel and owner. (*Id.* at p. 268.) The Fourth Circuit Court of Appeals reversed.

The circuit court "underscore[d] the Supreme Court's pronouncement in *Faragher* . . . that an isolated incident of harassment, if extremely serious, can create a hostile work environment." (*Boyer-Liberto*, *supra*, 786 F.3d at p. 268.) The court also emphasized the egregiousness of the epithet. "[A] reasonable jury could find that [the manager's] two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment." (*Id.* at p. 280.) The court cited, among other cases, *Ayissi–Etoh v. Fannie Mae* (D.C. Cir. 2013) 712 F.3d 572, which observed, as had other courts, " 'perhaps no single act can more quickly alter the conditions of employment' than 'the use of an unambiguously racial epithet such as "nigger" by a supervisor.' [Citation.] This single incident might well have been sufficient to establish a hostile work environment." (*Id.* at p. 577.) The concurring opinion commented, "[I]n my view, being called the n-word by a supervisor—as Ayissi–Etoh alleges happened to him—suffices by itself to establish a racially hostile work environment." (*Id.* at p. 580, conc. opn. of Kavanaugh, J.)

The DA's Office, while acknowledging the slur by Bailey's co-worker was "categorically unacceptable," nevertheless asserts " '[a]n isolated use of an epithet, however odious, does not produce a hostile work environment.' " (*Aguilar*, *supra*, 21 Cal.4th at p. 181.)  The DA's Office is simply mistaken on this point.  Indeed, it has quoted from the dissenting opinion in *Aguilar*.[4]

Moreover, the Legislature has since expressly declared:  "A single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment."  (§ 12923, subd. (b).)  "The existence of a hostile work environment depends upon the totality of the circumstances and a discriminatory remark, even if not made directly in the context of an employment decision or uttered by a nondecisionmaker, may be relevant, circumstantial evidence of discrimination.  In that regard, the Legislature affirms the decision in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512 in its rejection of the 'stray remarks doctrine.' "  (§ 12923, subd. (c).)  Although not effective until January 1, 2019, section 12923 codified numerous opinions concluding a single racial slur can be so offensive it creates a triable issue as to the existence of a hostile work environment.

Thus, the question is not whether a single, particularly egregious epithet can create a hostile work environment—under certain circumstances, it can.  Rather, the pertinent question is whether the single alleged racial epithet made by Bailey's co-worker was, in context, so egregious in import and consequence as to be " ' " 'sufficiently severe or pervasive to alter the

---

[4]  The DA's Office provided the wrong page cite for the quote, indicating it was at page 131, in the majority opinion.

conditions of [Bailey's] employment.' " ' " (*Etter*, *supra*, 67 Cal.App.4th at p. 465.)

"[R]acial epithets by supervisors . . . are commonly considered more serious because they are inherently vested with the employer's authority." Bailey acknowledges as much, but again citing to *Boyer-Liberto,* asserts "whether such a slur by a co-worker gives rise to a hostile work environment is at least a question of fact for the jury, not an issue of law for a court on summary judgment."

However, what the circuit court in *Boyer-Liberto* actually said was that "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.' [Citation.] Simply put, 'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.' " (*Boyer-Liberto*, *supra*, 786 F.3d at p. 278.) Thus, the court focused on whether the employee who used the epithet, a food and beverage manager, was the plaintiff's supervisor. (*Id.* at pp. 269–271.) Although "[w]hether [that manager] had been empowered by the [hotel] to fire Liberto or take other tangible employment actions against her [was] unclear on the record. . . . Liberto did not know that [the manager] held a manager title and did not consider [her] to be her manager." (*Id.* at p. 270–271.) The evidence further showed, however, that the manager "repeatedly and effectively communicated to Liberto . . . that [she] had [the owner's] ear and could have Liberto fired." (*Id.* at p. 279.) The court therefore concluded "in gauging the severity of [the

10

manager's] conduct, we deem [the manager] to have been Liberto's supervisor."[5] (*Boyer-Liberto,* at p. 280.)

Other cases have similarly commented on the significant difference between a slur by a co-worker and one by a supervisor. "In many cases, a single offensive act by a coemployee is not enough to establish employer liability for a hostile work environment. But where that act is committed by a supervisor, the result may be different." (*Dee v. Vintage Petroleum, Inc.* (2003) 106 Cal.App.4th 30, 36.) A "supervisor's use of the term impacts the work environment far more severely than use by co-equals." (*Rodgers v. Western-Southern Life Ins. Co.* (1993) 12 F.3d 668, 675.)

In fact, Bailey did not in the trial court, nor has she on appeal, cited to any case holding that a single, albeit egregious, racial epithet by a co-worker, without more, created a hostile work environment.

---

[5] In *Ayissi-Etoh v. Fannie Mae, supra,* 712 F.3d 572, when the plaintiff was promoted, he was the only one of ten new team leaders who did not receive a salary increase. (*Id.* at p. 576.) His manager, whose preferred candidate had not received one of the promotions, then began quarreling with the plaintiff on a regular basis. His manager also began to prepare critical evaluations. (*Ibid.*) Concerned, the plaintiff went to the chief audit executive, who allegedly told him: " 'For a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money.' " (*Id.* at p. 574.) When he later complained to the new vice-president, the latter allegedly shouted at him, " '[g]et out of my office nigger.' " (*Id.* at p. 575.) After the plaintiff filed a complaint with the EEOC, his Fannie Mae supervisor allegedly gave him a choice: drop the racial discrimination claim or be fired. (*Ibid.*) Shortly thereafter, he was dismissed. (*Ibid.*) Fannie Mae disputed most of this, and the circuit court concluded, not surprisingly, that triable issues precluded summary judgment on the plaintiff's discrimination claims. (*Id.* at pp. 576–577.) The court likewise concluded plaintiff had made a sufficient showing raising a triable issue of a hostile work environment—not only were there numerous asserted discriminatory acts, but these acts were by the plaintiff's supervisors (indeed, they went up the chain to a Fannie Mae vice-president). (*Id.* at p. 577–578.)

11

Nor has Bailey made any other factual showing that the conditions of her employment were so altered by the one slur by her coworker as to constitute actionable harassment.

We therefore agree with the trial court that "no reasonable trier of fact could reach [the] conclusion" "that her co-worker's single statement . . . , without any other race-related allegations, amounted to severe or pervasive racial harassment."

***There Is No Triable Issue That Defendants Failed to Take Corrective Action***

Bailey also maintains neither the District Attorney's Office nor the City conducted "a reasonable inquiry into her allegations and utterly failed to provide the 'prompt and appropriate corrective action' that could absolve it from liability."

"Harassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (§ 12940, subd. (j)(1).) " 'The employer is liable for harassment by a nonsupervisory employee only if the employer (a) knew or should have known of the harassing conduct and (b) failed to take immediate and appropriate corrective action. (§ 12940, subd. (j)(1).) This is a negligence standard.' " (*Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1419–1420.)

In Bailey's response to the District Attorney's separate statement of undisputed material facts, she did not dispute the following: "Plaintiff did not initially report Larkin's January 22 remark to her supervisor or HR. [¶] Instead, the next day, Plaintiff's supervisor overheard Plaintiff talking about the incident during an after-hours party. [¶] Plaintiff's supervisor then

12

reported the allegation to her supervisor, Sheila Arcelona. [¶] . . . [¶] After learning about Plaintiff's allegation, Arcelona promptly conferred with Clendinen and [Monachino-]Taylor. [¶] They agreed that Arcelona should first meet with Plaintiff to discuss and document the allegation, and that Taylor, as the Department Personnel Officer, should attend the meeting as well. [¶] They also agreed that Arcelona and [Monachino-]Taylor would then separately meet with Larkin. [¶] On January 29, Arcelona and Taylor met with Plaintiff. [¶] Plaintiff confirmed that January 22 was the only time that she had heard Larkin use any type of slur during Plaintiff's tenure at the DA's office. [¶] Arcelona and [Monachino-]Taylor then met with Larkin. [¶] Arcelona counseled Larkin about the City's Harassment-Free Workplace Policy, and she specifically informed her that any use of the alleged language from January 22 was unacceptable. [¶] After her meetings with Plaintiff and Larkin, Arcelona promptly provided a written summary of the meetings to Clendinen."

Bailey likewise did not dispute that the City's Department of Human Resources sent her a letter summarizing her allegations, acknowledging the slur was extremely offensive, and, stating that, if true, it "violated the City's Harassment-Free Workplace Policy, and that the DA's office would take corrective action." The letter concluded, however, that "one comment from a co-worker was 'not sufficiently severe or pervasive as to alter the condition of your employment and create an abusive working environment." Bailey also did not dispute that "on July 30, Clendinen met with Larkin regarding DHR's analysis" and "Clendinen required Larkin to execute an Acknowledgment of Receipt and Review of the City's Harassment-Free Workplace Policy, and this Acknowledgment was placed in Larkin's personnel file and a copy of it was sent to DHR."

13

Bailey characterizes these undisputed facts as "depict[ing] that the DAO/City's response to Larkin's racial slur against Bailey was at least negligent, but with Taylor-Monachino's central involvement metastasized into an aiding and abetting and, because of her authority as DAO HR Department Director responsible for responding to discrimination complaints, an outright 'ratification' [citation] of Larkin's initial racial slur." However, Bailey has never disputed that Taylor-Monachino's conduct was *not* motivated by any racial animus. Accordingly, Bailey cannot look to Taylor-Monachino's conduct as purported ratification of Larkin's alleged racial slur.

Bailey also asserts the "minimal remedial steps" taken by the DA's Office were "not necessarily sufficient," (italics omitted) relying on *Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612 (*Bradley*). The plaintiff in *Bradley,* an independent contractor social worker at Corcoran State Prison, was repeatedly sexually harassed, both at work and at home, by a prison chaplain. When the chaplain showed up at the plaintiff's home in the middle of the night, she called the police, who described him as "obsessed" and recommended she obtain a restraining order. (*Id.* at p. 1618–1620.) The plaintiff had reported the repeated sexual harassment to numerous prison authorities, including the Employee Relations Office. Two prison officials interviewed her, then "called the Corcoran police and Bradley's landlady to verify her story." (*Id.* at p. 1620.) The complaint was reported to the warden, who was told "a written report was coming." (*Ibid.*) The prison officials "told [the plaintiff] to prepare a written diary of what had occurred and to let them know if anything else happened." (*Ibid.*) The only remedial steps taken by prison officials consisted of advice to "to buy binoculars, not to go out alone, to get a restraining order, and to carry a cell phone." (*Id.* at p. 1621.) The plaintiff

14

was told an official had "talked to [the harasser] and given him a letter . . . however, [he] had not taken responsibility for his behavior, and [the official] could not assure [her] that [the harasser] would leave her alone." (*Ibid*.)  The harasser's supervisor was informed a complaint had been made, but was not told it was for sexual harassment, nor instructed to restrict his movement in the prison.  (*Ibid*.)  Instead, the harasser continued to have "free range of the prison and his supervisor had difficulty keeping track of his whereabouts," and he continued to harass the plaintiff.  (*Id*. at pp. 1621–1622.)  The plaintiff's employment, in contrast, was terminated, ostensibly for poor performance.  (*Id*. at p. 1622.)

The *Bradley* court affirmed a jury verdict in favor of the plaintiff. (*Bradley, surpa,* 158 Cal.App.4th at p. 1635.)  With respect to her claim that prison officials failed to take sufficient remedial measures, the court first explained:  "Once an employer is informed of the sexual harassment, the employer must take adequate remedial measures.  The measures need to include immediate corrective action that is reasonably calculated to (1) end the current harassment and (2) to deter future harassment.  [Citation.]  The employer's obligation to take prompt corrective action requires (1) that temporary steps be taken to deal with the situation while the employer determines whether the complaint is justified and (2) that permanent remedial steps be implemented by the employer to prevent future harassment once the investigation is completed.  [Citation.]  An employer has wide discretion in choosing how to minimize contact between the two employees, so long as it acts to stop the harassment.  [Citation.]  '[T]he reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment.' "  (*Id*. at p. 1630.)

15

The court then concluded the prison officials had abysmally failed to comply with this standard (*Bradley, surpa,* 158 Cal.App.4th at pp. 1631–1634), summarizing the situation as follows: "While we recognize that things move slowly in state government, the lack of action in this case is startling. Numerous people heard Bradley's complaints yet did nothing to protect her or to stop the harassment. Very little investigation was done, even though CDC claims it took immediate action by initiating the investigation. No one gathered any evidence other than Bradley's statement, which she was required to repeat numerous times. Each person she contacted acted like it was someone else's job to take immediate and corrective action. *Nothing* happened locally to ensure that [the harasser] would stop harassing Bradley, despite evidence that the harassment was severe, that [the harasser] was able to move freely around the institution, that physical threats had been made, and that [the harasser] had a known history for breaking rules and ignoring supervisorial direction." (*Id.* at pp. 1633–1634.)

The circumstances here are not comparable to those in *Bradley*. Bailey's claim that Larkin had used the racial epithet was promptly investigated after Bailey's supervisor reported it. Even though Larkin denied making the racial slur, she was both orally informed that "any use of the alleged language was unacceptable" and given a written copy of the City's Harassment-Free Workplace Policy. Larkin was required to meet first with the Assistant Chief of Finance (Arecelona) and then with the Chief Administrative and Financial Officer (Clendinen) who required Larkin to execute an acknowledgment of receipt of the anti-harassment policy, which acknowledgment was placed in her personnel file and a copy of which was sent to the human resources department. Unlike in *Bradley*, there is no claim the reprimand of Larkin failed to prevent further unacceptable

16

behavior. Measured by the employer's " 'ability to stop harassment by the person who engaged in harassment,' " the remedial action by the DA's Office and the City was effective. (*Bradley*, *supra*, 158 Cal.App.4th at p. 1630.)

We therefore also agree with the trial court that there is no triable issue that the DA's Office and the City failed to make a reasonable inquiry into Bailey's allegation or to take prompt and appropriate corrective action.

### *There Is No Triable Issue That Defendants Retaliated Against Bailey*

Bailey also challenges the trial court's ruling that she failed to show she "suffered a resulting adverse employment action" in retaliation for reporting Larkin's racial slur.

"[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) The term " 'adverse employment action' . . . does not appear in the language of the FEHA or in title VII, but has become a familiar shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under a relevant provision of an employment discrimination statute." (*Id.* at p. 1049.)

"[A] mere oral or written criticism of an employee or a transfer into a comparable position does not meet the definition of an adverse employment action under FEHA. [Citations.] . . . [T]he issue requires a factual inquiry and depends on the employer's other actions. An unfavorable employee evaluation may be actionable where the employee proves the 'employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.' [Citations.] Thus, although

17

written criticisms alone are inadequate to support a retaliation claim, where the employer wrongfully uses the negative evaluation to substantially and materially change the terms and conditions of employment, this conduct is actionable." (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1457.) "An adverse employment action refers not only to 'ultimate employment actions such as termination or demotion, but also . . . actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement.' [Citation.] That said, '[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable.' " (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 734.)

Bailey bases her claim that she suffered adverse employment actions on Taylor-Monachino's "course of conduct" and on comments made by her new supervisor in her June 2015 performance review.

Taylor-Monachino's "course of conduct," according to Bailey, included telling Bailey no harassment complaint would be filed and Bailey's own comments could constitute a hostile work environment for Larkin, making faces and chuckling at Bailey, refusing to speak to her, and on one instance, mouthing the words " 'You are going to get it.' "

"[A] mere offensive utterance or even a pattern of social slights by either the employer or coemployees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment." (*Yanowitz, supra*, 36 Cal.4th at p. 1054.) " ' "A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient."

18

[Citation.] " '[W]orkplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." ' " [Citation.]' For example, ' "[a] mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action under [the] FEHA." ' [Citation.] Similarly, '[m]ere ostracism in the workplace is insufficient to establish an adverse employment decision.' " (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 92.) Under these standards, Taylor-Monachino's "course of conduct" does not rise to the level of an adverse employment action.

Turning to Bailey's June 2015, performance review, Bailey's new supervisor noted two areas for improvement: "regular attendance, and responsiveness to supervisory requests." Bailey maintains those comments "derived directly from the emotional and psychological effects of the racial slur and the [DA's Office's] failure to properly address or remedy the situation," and thus were, in combination with Taylor-Monachino's alleged actions, an adverse employment action.

To begin with, Bailey's assertion that she suffered emotional upset due to Larkin's alleged racial slur which affected her performance, which, in turn, precipitated the improvement comments, is not an assertion that any supervisor was retaliating against Bailey for complaining about Larkin's offensive language. In addition, to the extent the noted areas for improvement could be considered criticism of Bailey's performance, mere "written criticism of an employee . . . does not meet the definition of an adverse employment action under the FEHA." ' " (*Light v. Department of Parks & Recreation, supra,* 14 Cal.App.5th at p. 92.) Indeed, Bailey's

19

supervisor gave her the same overall rating, "Met Expectations," that Bailey had received each of the prior two years.

We therefore additionally agree with the trial court that neither Taylor-Monachino's alleged "course of conduct," nor the improvement comments in Bailey's performance review rise to the level of an adverse employment action.

## DISPOSITION

The judgement is affirmed. Costs on appeal to respondents.

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Margulies, J.


A153520, Bailey v. San Francisco District Attorney's Office et al

21